1. A., B., C., and D., having a dispute about their rights in a railroad company, entered into a contract of settlement, by which they divided the stock in certain proportions among them. A. refused to carry out the contract. B. filed a bill to compel him to stand to his agreement. A.,

---

\* 1 Black, 179.

after answering, filed a cross-bill, insisting that B. ought to have made C. and D. parties to his original proceeding. *Held*, that the bill, not seeking any relief against B. and C., it was not necessary that they should be parties.

2. Equity will not set aside a contract whose purpose is a settlement of disputes, simply because one party to it was in want of money when he made it, and because such want may have been an inducing cause for his making it; the party having been an intelligent person, who acted deliberately and with knowledge of what he was doing. Equity favors amicable compromise of controversies where pecuniary interests are complicated and conflicting.

APPEAL from a decree of the Circuit Court for the District of Virginia; the case was thus:

In the year 1854 the legislature of Virginia passed an act to incorporate the *Washington and Alexandria* Railroad Company. Two persons, J. S. French and Walter Lenox, subscribed for the whole stock; French taking three-fourths and Lenox one-fourth, and French being made president of the company. The road was built. French and Lenox, however, spent very little money of their own in its construction, but raised large sums by borrowing. When, therefore, the road was built the company was seriously embarrassed. Two deeds of trust had been executed in 1855, and in 1857 another deed was made to Lenox, as trustee, to secure bonds, issued to raise money for the purposes of the road.

The civil war broke out when the road was in this condition. French and Lenox went South, and the government took military possession of the road.

During their absence, a proceeding was instituted in the Alexandria County Court for the removal of Lenox as trustee in the deed of trust to him, and for the substitution of a new trustee in his place. A new trustee, one Stewart, was appointed, and he proceeded in alleged conformity to the deed of trust to sell the railroad.

Under the sale thus made, a new company was organized, which assumed the name of the Washington, Alexandria, *and Georgetown* Railroad Company; and the government having relinquished the road in 1865, this company took

possession of it at once; and not long afterwards entered into a contract with the Adams Express Company, represented by one Shoemaker, in relation to the conveyance of express freight, and the furnishing by the company of means to work the road. This contract did not prove satisfactory, and by consent of both parties, a lease for ten years was made to two persons, named Stevens and Phelps, in May, 1866; and in the following June, another contract for means of operation and for the conveyance of express freight was made for ten years with the Adams Express Company.

Litigation soon arose upon this lease and upon these contracts. One Davison, asserting himself to be a stockholder of the Washington, Alexandria, and *Georgetown* Railroad Company, filed his bill in the Alexandria County Court, in November, 1866, alleging that the lease was made without authority, and in fraud of the rights of the stockholders, and praying that it might be set aside and annulled. The Adams Express Company filed its bill about the same time, in the Circuit Court of the United States for the District of Virginia, praying for the enforcement of its contract with the company, and with the lessees; and under that proceeding an order was made by the Circuit Court for the appointment of receivers of the road, who took possession.

The Washington and Alexandria Railroad Company, describing itself as *that company, by J. S. French, its president*, had already in March, 1866 (the government having, with the suppression of the rebellion, given up, as already said, its possession, and French and Lenox having returned from the South), filed its bill in the Alexandria County Court asserting its title to the road, charging fraud in the whole proceeding for the organization of the Washington, Alexandria, and *Georgetown* Railroad Company, and praying that it might be declared void, and that a decree might be made establishing its own original title to the road as unimpaired by that proceeding. But French, when he returned to Alexandria, was very needy, and so much in debt that he was quite without means to work this railroad if he had had it, or even to get a decree establishing the old company's

title to it. Lenox was little or no better off. And the debts of the road were very heavy.

In this condition of their pecuniary concerns, and in the general state of opposed and opposing interests, in November, 1866, French and Lenox had an interview in Washington, at the house of Mr. Merrick, who had been the counsel of Stevens and Phelps, with Shoemaker (representing the Adams Express Company), Stevens and Phelps, the lessees under the new, or as it was sometimes styled the "spurious" road, and Dean Smith, who had been counsel of Shoemaker, at which interview an inchoate agreement was made for the organization of a new company and the payment of the debts of the old one. This meeting, which was a long one, and where the whole condition of things was largely gone into, was apparently satisfactory to French. Shoemaker, Stevens and Phelps, and Smith were the active managers of the Washington, Alexandria, and *Georgetown* Railroad at this time, and perhaps its formal directors, but all seemed to be of the opinion that the sale by the trustee Stewart and the new organization could not stand in law.

This inchoate agreement remained unacted upon for some months, its details being the subject of conversations among the parties. It was subsequently reduced to writing, and at another meeting signed by all the parties except French, who was absent. It was not then dated; the date was left in blank.

The stipulations of this agreement in substance were:

1st. That French and Lenox would convey all their interest in the Washington and Alexandria Railroad Company to a corporation to be formed as specified, or to devote all of that interest to the common benefit of the parties, in the proportion specified, should the Washington and Alexandria Railroad be revived and the corporation by that name again come into existence.

2d. That when the parties should have agreed to reorganize and should actually reorganize that company, or should organize another company on the basis of the title of French and Lenox, Stevens and Phelps would assign to the company

all their interest as lessees of the Washington, Alexandria, and *Georgetown* Railroad Company, or hold the same for the exclusive use of the parties to the agreement, according to their respective interests.

3d. That Shoemaker, for himself and the Adams Express Company, would aid the corporation to be formed or reorganized by money and credits; that is, to pay, settle or compromise all liabilities of the Washington and Alexandria Railroad Company, the liabilities of the lessees of the Washington, Alexandria, and *Georgetown* Railroad Company for stock and materials for the road, and all the *bonâ fide* liabilities incurred by them in behalf of the road; Shoemaker to be substituted in all rights of creditors paid by him; all compromises to be for the benefit of all the parties or the new organization; no advances to discharge liens to be refunded until the final end of litigation; a majority in interest to have the right to substitute other securities for any thus acquired by him; and the net receipts of the company to be formed or reorganized to be devoted to reimburse the advances made by him, except 20 per cent. of the receipts, to be divided among the parties to the agreement in proportion to their interests.

4th. That the agreement should be carried into effect on the rendering of the decree of the Alexandria County Circuit Court in the case of The Washington and Alexandria Railroad Company *v.* The Washington, Alexandria, and *Georgetown* Railroad Company, and the new company to be formed or reorganized with a capital stock of 3000 shares, to be divided among the parties thus: French and Lenox, 1250; Stephens and Phelps, 850; Shoemaker, 500; Dean Smith, 200; G. W. Brent, 200.

5th. The lessees to be continued under the new corporation as general superintendent and manager, receiving $250 per month each until otherwise ordered by the board of directors, as to salary.

When the agreement thus reduced to writing was presented to French, early in the year 1867, by Mr. G. W. Brent, who was the professional adviser of French and

Lenox, French refused to sign it, for certain reasons which were the subject of conversation between him and Brent; one of the reasons being that a certain $5000 which were to be advanced to him were not provided for in the agreement. Finally, however, on the 6th of December, 1867, French signed the contract. On the same day a separate contract was made between French and Shoemaker, by which the latter advanced the former $5000 on the transfer to the latter of French's right and interest in the road. By this separate deed from French to Shoemaker, French conveyed, on account of $5000 paid him by Shoemaker, all his right and interest in the railroad, for the purpose of securing the payment of the $5000, and for the purposes set forth in the agreement of same date, 6th December, 1867.

After the courts in Virginia had finally decided, as they did on 28th August, 1868, the case of The Washington and Alexandria Railroad Company *v*. The Washington, Alexandria, and *Georgetown* Railroad Company in favor of the plaintiff therein, reinstating the said company and annulling the charter of the new company, Lenox (September 22d, 1868) called a meeting of the parties who had signed the agreement of 6th December, 1867; the purpose of the meeting being to carry into effect the provisions of that agreement. French was present at the meeting. The meeting directed, among other things, that Mr. Brent should prepare and publish a call to form the new company in accordance with the provisions of the Virginia code. The proceedings were printed and French received a copy. Acting under the instructions given to him, Brent did prepare a form of call and caused to be called a meeting at the Mansion House Hotel, in Alexandria, Va., for the 29th October, 1868.

The meeting was duly held. Lenox was present, and voted on the stock assigned him by the agreement of 6th December, 1867. Shoemaker was elected president of the company. One day previously, that is to say, on the 28th day of October, 1868, French filed a bill of complaint in the Circuit Court of Alexandria County, Virginia, against Shoemaker, the Adams Express Company, and Lenox, setting

forth that Lenox had made a fraudulent combination with Shoemaker to injure and annoy the said Washington and Alexandria Railroad Company, and had called a meeting of stockholders at the Mansion House, in Alexandria, for the 29th October, and he prayed an injunction against them to forbid their holding the meeting under said notice, from electing a board of directors, &c.

In the meantime, that is to say, on the 30th day of September, 1868, a writ of possession had been issued from the Circuit Court of Alexandria County, Virginia, in the suit of The Washington and Alexandria Railroad Company v. The Washington, Alexandria, and *Georgetown* Railroad Company, commanding the sheriff to put the former, the plaintiff, into possession of the railroad and its appurtenances. This writ of possession was taken out by French, as president of the company.

Hereupon Shoemaker filed in the Circuit Court of the United States for Virginia, against French, the bill on which the decree now appealed from was made. The bill had been prepared and was sworn to by Shoemaker on the 27th of October, 1868. A subpœna, ordered against French on the same day, and a rule to show cause why an injunction should not be issued, were served on French, all on the same 27th October; the day before he, French, applied for an injunction to prevent the meeting at the Mansion House to organize the new company.

The bill set forth most of the facts above stated, that the complainant had offered to convey to French his interest in the stock and property of the Washington and Alexandria Railroad Company, on his paying the $5000 advanced, which he had refused to do. It then prayed that the said French might be restrained from doing any act whatever as president of the Washington and Alexandria Railroad Company; from interfering with the road and property of the said company, or with the complainant and the parties to the agreement, in carrying out the provisions thereof and in organizing a new company, or from taking any legal proceedings for that purpose; and prayed, further, that French's interest

might be sold by a commissioner of the court for the payment of the said sum of $5000.

The answer of French set up as its main defence needy circumstances and imposition. It was thus:

"The parties—Shoemaker, Stevens, Phelps, Smith—whom the defendant met at Mr. Merrick's, were all strangers to him. Some of them he had never seen before; others of them he had seen and knew by sight. His interview with them was solely on the recommendation of his counsel, G. W. Brent. Such was the embarrassment under which the defendant was suffering, resulting from the fraudulent deprivation of his property and the consequent want of himself and family, that he was scarcely in a condition to investigate the nature of the proposition; and such was the confidence which he had in his attorney, the said G. W. Brent, under whose counsel he acted, that it was impossible for him to suspect the propriety or the advantages of the proposition thus made to him. Before, however, these propositions were reduced to writing, the defendant was suddenly called by telegraph to his home in Southwestern Virginia, on account of the illness of a member of his family. This was in the month of November, 1866. The defendant heard nothing more of these negotiations until his return, in the month of January, 1867, when the contract referred to in complainant's bill, signed by the complainant, the said Stevens, Smith, Brent, and Lenox, was handed to the defendant by the said Brent, and the defendant was pressed by him to sign the same. The defendant declined to sign it, upon the grounds that it was not in accordance with the verbal agreement; that it contained no stipulation for the advance of the sum which was agreed to be advanced to the defendant, and the advance of which was the great inducement to his making the said agreement; and that the contract, in many particulars, was essentially different from the agreement discussed at the meeting. The defendant was then threatened by the said Stevens, and those acting in concert with him and the complainant, that they would keep the defendant out of possession of the road for years; that they would set up the contract in a court of equity, and making the impression upon the mind of the defendant that, by protracted litigation, they would render his property in said road unavailing to him. Thus assailed, importuned, and threatened, the defendant,

after having for nearly one year resisted their influences, being greatly pressed by his necessities, was at length forced to sign the said contract upon the condition that the complainants would advance to the defendant the sum of $5000, and the further condition that the contract should be immediately carried into effect.

"The defendant avers that the contract was void in law and equity, because against public policy, having been fraudulently made by the said complainant, Stevens, Smith, and Phelps, in violation of the fiduciary relations they sustained to the said Washington, Alexandria, and *Georgetown* Railroad Company; that the contract to purchase the interest of the said defendant and· the said Lenox, and to furnish, supply, and advance the means to carry on the litigation of the suit then pending was illegal, and of the nature of champerty; and that for these reasons, if there were none other, the complainant is not entitled to the relief prayed for in his said bill, and especially is not entitled to the injunction prayed for therein; the contract being obnoxious to the maxim that '*ex turpi contractu non oritur actio.*'

"That upon the face of the contract there was no consideration sufficient to support said contract, and that it was drawn with the fraudulent purpose and design of deceiving and defrauding the defendant, and he 'avers that the assignment aforesaid, which he executed only as a mortgage to secure the $5000 advanced to him by the complainant, was fraudulently prepared by the complainant, the said Smith and the said Stevens, with the design of deceiving the·defendant into an assignment of his interest and estate in the said road, for purposes other than that which he intended.

"The defendant averred that the complainant, Phelps, Stevens, Smith, and Brent, have conspired together for the purpose of oppressing and defrauding him; that to this end they have imposed upon his confidence, taken advantage of his necessities, seized upon his property, appropriated the earnings of the road, three-fourths of the stock of which is owned by him, for the purpose of preventing the company, of which he is president, from obtaining possession of the road."

A cross-bill was also filed by French to set aside the arrangement. It set up the same facts as the answer; admitting, notwithstanding, that he, French, was for a long time

willing and anxious to carry out the arrangement, and asserting that the other parties had wholly failed to perform their part of it, though he, French, had frequently urged them to do so. It further insisted that Stevens and Phelps were necessary parties to the original bill. The answer to the cross-bill denied all its important allegations of fact.

The case as made out by the proofs was much as that already stated. There was no doubt that French was needy, and it seemed probable that his want of money was the prevailing consideration with him when he finally determined to sign the contract, but it was not proved that he acted unadvisedly or otherwise than his best interests in the complicated and embarrassed condition of the road and his own embarrassed condition might reasonably seem to suggest.

The questions were: 1. Whether Stevens and Phelps were necessary parties to the original bill. 2. If not, whether the contract of December 6th, 1867, was binding on French? If it was, then of course his act in taking possession of the road with the view of excluding the other parties to the contract, and his application to the Circuit Court of Alexandria County, Virginia, for an injunction to restrain the parties to the agreement from holding a meeting to reorganize, was a breach of faith which justified the complainant in invoking the authority of the Circuit Court against him.

As to the first point the court below said:

"If the original bill sought any relief as against Stevens and Phelps, or any aid from the court in carrying into effect the settlement contract as to them, it would be necessary to make these persons parties. But such is not the case. The bill seeks no relief as against them. There does not appear to be any controversy between them and the original complainant. And we cannot see that the cross-complainant has a right to have any controversy he may have with them settled in this suit. It is very certain that at the time the settlement contract was made he had no cause of complaint against them. Nothing, so far as they were concerned, appears to have been concealed from him. The plain language of the agreement, which he had before him nearly a whole

year, stated their relation, and gave all the notice of circumstances connected with them which a court of equity will require. If their subsequent conduct affords ground of complaint, it must be in regard to the stock assigned to them; but this may be, and should be, as we think, submitted to judicial scrutiny, in a proceeding founded on the settlement contract; not hostile to it. The objection that Stevens and Phelps are not made parties to the original bill must therefore be overruled."

On the second point—the merits—the court was of opinion that the equity of the case was with the complainant, and accordingly decreed that French be enjoined from any use of the title of the president of the Washington and Alexandria Railroad Company, and from any action to interfere with any proceeding for the reorganization of the said company under the contract of the 6th of December, 1867, and from any proceeding whatever not in accordance with the said contract, without prejudice, however, to his right to the stock assigned to him by the said contract, or to assert any claim he might have against the company reorganized under the contract, or against Shoemaker, or against the Adams Express Company, not in contravention of the contract, or to pursue by proper proceedings in law or equity any claim he might have in respect to the distribution of stock made by the contract, founded upon failure of consideration or other cause.

From this decree French brought the case here by appeal.

*Messrs. H. O. Claughton and B. Stanton, for the appellants; Messrs. T. J. Durant and J. H. Bradley, contra.*

Mr. Justice CLIFFORD delivered the opinion of the court.

Complicated as the transactions are out of which the present controversy has arisen, it will be impossible to explain the grounds of our decision in a manner which will be satisfactory to the parties, without giving in the first place a pretty full statement of the facts.

On the twenty-seventh of February, 1854, the legislature

of Virginia passed an act incorporating a. company to construct a railroad between Alexandria and Washington, by the name of the Alexandria and Washington Railroad Company, and the record shows that three-fourths of the stock of the company was taken by James S. French, and the other fourth by Walter Lenox, and that they continued to own the whole stock of the company and the entire railroad until they conveyed the same to the complainant. They proceeded to build the road, and in procuring means for that purpose they contracted large money obligations, and to secure those obligations they executed the three deeds of trust mentioned in the bill of complaint; that on the breaking out of the rebellion they went within the lines of the insurgents, and our government took possession of the railroad and used it for military purposes; that during their absence within the insurgent lines Joseph Davison presented a petition to the County Court of the State representing that he was the agent and attorney of all the holders of the bonds in the deed of trust to Walter Lenox, and that the trustee therein named was incapacitated from acting as such, and praying that a certain other person named might be appointed in his place; that the County Court removed the trustee named in the trust deed and appointed the person mentioned in the petition as substituted trustee, and that the substituted trustee subsequently, on the 10th of April, 1862, sold the railroad and everything belonging to it to the persons named in the record, and that the purchasers and others associated organized, or pretended to organize, a new company, called the Washington, Alexandria, and Georgetown Railroad Company. When the government relinquished the road, some time in the year 1865, this new company took possession of the same, and on the first of February entered into a contract with the Adams Express Company in relation to the conveyance of express freight and the furnishing by the latter of means to operate the road. On the twenty-eighth of March, 1866, French and Lenox, having returned, caused a suit to be instituted in the County Court in the name of the Washington and Alexandria Railroad Company against

the new company organized or pretended to be organized under the sale, to recover the railroad and property belonging to it, upon the ground that the whole proceedings by which the sale was made and the new company was formed were fraudulent and null and void. Dissatisfaction arose as to the contract with Adams Express Company, and on the fifth of May, 1866, by consent of both parties a lease for ten years was made by the new or spurious company to Oscar A. Stevens and W. J. Phelps, and on the eighteenth of June following another contract for means of operation and in respect to the conveyance of express matter was made for ten years with the same express company. Litigations ensued with respect to those contracts, some of which were pending when the contracts which are the foundation of the present litigation were executed, and others were commenced at a later period. Serious embarrassments surrounded the parties who had caused the suit to be instituted to set aside the pretended sale of the road during their absence within the insurgent lines, and it was at this stage of the controversy, in November, 1866, that it was arranged that the parties interested should meet for consultation, as shown by the proofs, and as admitted by the respondents. James S. French, S. M. Shoemaker, Walter Lenox, Oscar A. Stevens, J. Dean Smith, and R. T. Merrick were present at the interview. Satisfactory proof is exhibited that they came to an amicable arrangement, subject to the condition that the pending suit in the County Court to set aside the pretended sale of the railroad should be determined in favor of the old company. They separated at the close of the consultation without reducing the agreement to writing, but it was drawn up in form, leaving the date blank, not long after, and was signed by all the parties except the complainant and respondent, who were not present. By the proofs, however, it appears that the complainant signed it shortly after and the respondent, on the sixth of December, 1867, also signed it, though he earnestly objected to signing it when it was first presented to him for that purpose not long after it was signed by the other parties. He not only signed the agreement, but at

the same time executed a conveyance of all his interest in the railroad to the complainant to secure the repayment of five thousand dollars advanced to him by the grantee, and covenanted that it should be held by the grantee for the purpose and objects declared in the contract executed at the same time.

1. By that contract French and Lenox agreed to convey all their right, title, and interest in the railroad to a corporation to be formed as specified, if such a company was formed, or to devote all their interest to the common benefit of the parties thereto, in the proportions specified, if the old company should be revived.

2. Stevens and Phelps agreed, if the parties decided to reorganize the old company or to form a new one as there suggested, to assign all their interest as lessees of the spurious company to such new company, or to hold the same for the exclusive benefit of the parties to the contracts in the proportions therein specified.

3. On behalf of himself and Adams Express Company the complainant agreed to aid the organization to be formed or revived, by money and credit, to pay, settle, or compromise all liabilities of the old company, and the liabilities of the lessees of the spurious company, for procuring stock and materials for working the road, and all other *bona fide* liabilities incurred by them on behalf of the road, the claimant being substituted to all the rights and remedies of any such creditors for the benefit of the parties to the agreement or the organization by them formed or revived, subject to certain conditions therein specified, excepting twenty per cent. of the receipts, which it was agreed should be divided among the parties to the instrument according to their respective interests.

4. They also agreed that the arrangement should be carried into effect on the rendition of the decree of the County Court in the pending case before mentioned, and that the company should then be formed and organized with a capital stock of three thousand shares, to be divided and distributed as follows: French and Lenox to have twelve hundred and

fifty shares, Stevens and Phelps to have eight hundred and fifty shares, S. M. Shoemaker to have five hundred shares, J. Dean Smith to have two hundred shares, and George W. Brent also to have two hundred shares.

5. It was also agreed that the lessees should be continued as general manager and superintendent, at two hundred and fifty dollars each as salary until otherwise ordered by the directors.

Five thousand dollars were paid by the complainant, or agreed to be paid, at the date of the agreement, and in consideration thereof the respondent executed the instrument called the assignment, in which he acknowledges the payment of that sum of money, and proceeds to say, " I do hereby assign, convey, transfer, and set over unto the said S. M. Shoemaker or his assigns, all my right, title, interest, claim, and demand in and to the property, stock, road, road-bed, franchise, and charter of the corporation known as" the old company, or " any interest I may possess in and to the same, and do further agree to make such other and further conveyances or assurance as may be hereafter required by the grantee or his assigns for the following purposes," to wit: (1.) To secure the payment of five thousand dollars due to the grantee as an advance on the same. (2.) For the purposes and objects set forth in the agreement bearing even date herewith, between the parties therein named, and which is particularly described in the pleadings.

Various defences were set up in the answer, but those chiefly to be noticed are the two following: (1.) That the signature of the respondent to the contract was obtained by fraud and oppression, that it is void as against public policy, and because it was fraudulently obtained. (2.) That the assignment, though intended only as a mortgage to secure the five thousand dollars advanced to him by the complainant, was fraudulently prepared with the design of deceiving the respondent into an assignment of his interest and estate in the road, and that he was compelled to sign it by threats, oppression, and persistent and deceptive influences and importunities.

Proofs were taken and the parties were fully heard upon the bill, answer, and replication, and upon the cross-bill, answer, and replication, and upon the proofs, and the Circuit Court being of the opinion that the equity of the case was with the complainant, granted an injunction perpetually restraining the respondent from any and every proceeding not in accordance with the contracts. Appeal was regularly taken to this court, and the principal error assigned here is that the Circuit Court erred in setting up and enforcing the contracts for the conveyance by the respondent of his right, title, and interest in the railroad to the complainant.

Complaint is also made that the decree of the Circuit Court is equivalent to a decree for specific peformance, but it is clear that it cannot be viewed in that light, as the contracts were executed and the conveyance made and delivered nearly a year before the bill of complaint was filed, nor is that the theory of the defence as set up in the answer or in the cross-bill. On the contrary, they both admit the execution of the agreement and the assignment to secure the sum advanced, but the respondent appears to rely chiefly for his defence upon the circumstances of hardship, imposition, and oppression alleged in the answer as affording a just ground to deny the prayer for relief contained in the bill filed by the complainant. He admits that the conveyance was made to secure the sum of five thousand dollars, but he alleges that he tendered the amount to the complainant on condition that the complainant would reconvey the property to him to be held as it was prior to the assignment, and that the complainant refused to receive the money on those terms.

Fraud is certainly charged in the answer, but the charge is wholly unsupported by any satisfactory proof, and the charge is virtually abandoned by the cross-bill, in which it is alleged that the respondent, notwithstanding the oppression and injustice which compelled him to execute the agreement, was willing and anxious, and for a long time continued to demand, that the same should be carried out according

to its spirit and intent.    What he there alleges as matter of complaint is that it was his necessities which compelled him to make the sacrifice and to surrender his stock on the hard terms of the agreement, and yet he affirms that he would have been satisfied if the other parties to the agreement had fairly and honestly performed their part of the same, but he alleges that they have utterly failed so to do, though often reminded of the delinquency and repeatedly urged to commence their peformance.    Many instances of such alleged failures are specified, but it is a sufficient answer to them all to say that they are separately denied in the answer to the cross-bill, and that the party making the charges has failed to introduce any sufficient proof to warrant a finding in his favor in respect to any one of the accusations.    Nearly eight months elapsed after the contracts were signed before the County Court rendered their decree annulling the charter of the spurious company and restoring the railroad to its rightful owners.    They entered the final decree on the twenty-eighth of August, 1868, and on the twenty-second of September following Walter Lenox called a meeting of the parties to the agreement, and the record shows that the respondent was duly notified and that he attended the meeting. He not only attended the meeting but he knew that the persons composing the meeting intended to effect an organization under the agreements described in the pleadings, as they directed one of their number to prepare and publish a call for another meeting to carry that purpose into effect in accordance with the code of the State and as contemplated by the terms of those agreements.    Acting under those instructions the person designated for the purpose prepared the form of a call for such a meeting to be held on the twenty-ninth of October then next, and caused the same to be published; and the record also shows that the meeting was regularly held pursuant to the call for the same, and that the company was duly organized at that meeting by the choice of the complainant as president of the company. Prior to that meeting, however, to wit, on the thirtieth of the preceding month, the respondent, claiming to act as

president of the road, obtained a writ of possession under the decree annulling the pretended sale of the road, and it appears that he was put in possession of the road by the sheriff, to whom he delivered the writ for that purpose. Instead of co-operating with the other parties to perfect the organization the respondent applied to the County Court for an injunction to restrain the other parties from holding the meeting called for that purpose, but the subpœna was issued in this case on the same day and the complainant obtained a rule requiring the respondent to show cause why an injunction should not issue restraining him from doing any act as president of the road, and from interfering in any way to prevent the execution of the agreement, and it appears that the subpœna and the order to show cause were served on him the day before he obtained his injunction forbidding the contemplated meeting.

Sufficient has already been remarked to show that the defence of fraud is not proved, but inasmuch as that defence is set up in several forms in the answer it may be necessary to say that the antecedent remarks upon the subject apply to that defence in every form in which it is presented. Reference has also been made to the defence that the respondent was compelled to sign the contracts by threats, oppression, and by persistent and deceptive influences and importunities, but it becomes necessary to state that defence more in detail and to give it a more careful consideration.

He alleges that he was induced to sign the two instruments by threats that if he refused he should be kept out of the possession of the road for years, and that in consequence of his pecuniary embarrassments and through fear that the parties would render his property unavailing to him in case he continued to resist their importunities, he finally executed the agreement; that being pressed for the want of pecuniary means and overcome by threats, importunities, and deceptive influences, he was ultimately forced to sign the agreement upon the condition that the complainant would advance him five thousand dollars, and that the contract should be immediately carried into effect.

Even if admitted to be true the answer does not show that the instruments were executed under duress, as the respondent admits that the sum of five thousand dollars was to be advanced as a part of the consideration for the transfer, and that he finally consented to the arrangement on the condition that the contract should be immediately executed. Much discussion to show that a contract or written obligation procured by means of duress is inoperative and void both at law and in equity is hardly required, as the proposition is not denied by either party. Actual violence, even at common law, is not necessary to establish duress, because consent is the very essence of a contract, and if there be compulsion, there is no actual consent, and moral compulsion, such as that produced by threats to take life or to inflict great bodily harm, as well as that produced by imprisonment, is everywhere regarded as sufficient in law to destroy free agency, without which there can be no contract, because in that state of the case there is no consent.* In its more extended sense duress means that degree of constraint or danger, either actually inflicted, or threatened and impending, which is sufficient in severity or in apprehension, to overcome the mind and will of a person of ordinary firmness.† Decided cases may be found which deny that contracts procured by menace of a mere battery to the person, or of trespass to lands, or of loss of goods, can be avoided on that account, and the reason assigned for that restriction to the general rule is that such threats are held not to be of a nature to overcome the mind and will of a firm and prudent man, because it is said that if such an injury is inflicted sufficient and adequate redress may be obtained in an action at law, but the modern decisions in this country adopt a more liberal rule, and hold that contracts procured by threats of battery to the person or of destruction of property may be avoided on the ground of duress, because in such a case there is nothing but the form of a contract without the

---

* Brown *v.* Pierce, 7 Wallace, 214.

† Chitty on Contracts, 217; 2 Greenleaf on Evidence, 283.

substance.* 'Grant all this and still the concession cannot benefit the respondent, as the proofs exhibited in the record are not sufficient to support the charges as made in the answer. Substantially the same charges are made by the respondent in his cross-bill, and every one of them is denied by the complainant under oath in his answer to that bill.

Enough appears in the record to convince the court that the respondent was in straitened circumstances, that his business affairs had become complicated, that he was greatly embarrassed with litigations, and that he was in pressing want of pecuniary means, but the court is wholly unable to see that the complainant is responsible for those circumstances or that he did any unlawful act to deprive the respondent of his property, or to create those necessities or embarrassments, or to compel him to do what he acknowledges he did do, which was to yield to the pressure of the circumstances surrounding him, and as a choice of evils accepted the advance of five thousand dollars and the shares assigned him in the new organization as proposed, and voluntarily signed both the agreement and the assignment. Such an act as that of signing those instruments, under the circumstances disclosed in the record, must be regarded, both in equity and at law, as a voluntary act, as it was unattended by any act of violence, or threat of any kind, calculated in any degree to intimidate the party or to force the result, or to compel that consent which is the essence of every valid contract. Suppose he consented reluctantly, as he avers, still the fact is that he did consent when he might have refused to affix his signature to the instruments, as he had repeatedly done for the year preceding; and having consented to the arrangement and signed the instruments he is bound by their terms, and must abide the consequences of his own voluntary act, unless some of his other defences set up in the answer have a better foundation.

Want of consideration is also averred in the answer, but

---

* Foshay v. Ferguson, 5 Hill, 158; Central Bank v. Copeland, 18 Maryland, 317; Eadie v. Slimmon, 26 New York, 12; 1 Story's Equity Jurisprudence, 9th ed. 239.

the terms of the instrument disprove the allegation, and the proofs introduced by the respondent as well as those introduced by the complainant show that the defence is unfounded.

Mistake and misapprehension on the part of the respondent are alleged, but the allegation is not sustained by any satisfactory proof, and the attending circumstances, taken in connection with the lapse of time from the original meeting to the time the respondent signed the instrument, convinces the court that the defence is without merit, which is all that need be remarked upon the subject.

Delay in execution of the contract is also alleged in the cross-bill, and that the complainant has failed to perform his part of the agreement, but those allegations are expressly denied in the answer to the cross-bill, and being unsustained by any satisfactory proofs the defence must be overruled.

Inequitable and unconscionable contracts, it is said, ought not to be sustained, but it is not possible to regard the arrangement in question as falling within that category, as by the terms of the agreement the complainant was to advance five thousand dollars to the respondent and to aid the organization by money and credit, to pay, settle, and compromise all liabilities of the old company and the liabilities of the lessees of the spurious company, for procuring stock and materials for working the road, and all other *bonâ fide* liabilities incurred by them in behalf of the road. Authentic data to enable the court to compute the amount of those liabilities are not given in the record, but enough appears to satisfy the court that they must have been very large, and amply sufficient to constitute a valuable consideration for the contract.

Suggestion is also made that the contract was against public policy, as some of the parties were interested in the spurious company, but the court is of the opinion that the charge is without any foundation, as it is clearly proper that parties whose pecuniary interests are complicated and conflicting should compromise the controversy, nor is it possible to see how the respondent is injured even if some one or more of

the parties failed to perform their duty to the spurious company which was annulled.

Suffice it to say, in respect to the alleged want of proper parties, that the court is of the opinion that the objection cannot be sustained, and being entirely satisfied with reasons given for overruling the objection in the Circuit Court it is not necessary to give the point any further examination.

Want of mutuality in the contract is also suggested, but it is clear that the suggestion is not well founded, as the covenants to make the advance, pay the debts and liabilities of the company, and to allot the stock as stipulated, could be enforced by suit in any court of competent jurisdiction.

Strong doubts are entertained whether any of those defences to the merits are open to the respondent, as the general rule is that where fraud is charged in the bill or set up in the answer, the party making the charge, if it is denied in a proper pleading, will be confined to that issue, but the court being disinclined to place the decision upon that ground has determined to give each defence a separate examination.*

Parties who execute contracts must expect that they will be enforced when due application for that purpose is made to a court of justice, nor can they reasonably hope that courts of justice will reopen matters which they have voluntarily and understandingly closed. Even if the terms of adjustment were unfavorable to the respondent still he is bound by the arrangement, as he voluntarily signed both the agreement and the assignment. Had he refused his assent to the arrangement the case might have been different, but the proofs show that he signed instruments after he had ample time for inquiry, examination, and reflection, and having done so, neither a court of equity or a court of law can release him from the obligation to fulfil his contracts according to the terms of the instruments.

DECREE AFFIRMED.

* Eyre v. Potter, 15 Howard, 42; Fisher v. Boody, 1 Curtis, 206; Price v. Berrington, 7 English Law and Equity, 254.