PETTERSSON et al. v. EMPIRE TRANSP. CO.

(Circuit Court of Appeals, Ninth Circuit. October 7, 1901.)

No. 646.

1. SEAMEN—SETTLEMENT ON DISCHARGE—CONCLUSIVENESS OF STATUTORY RELEASE.

> Under the provisions of Rev. St. §§ 4549, 4552, requiring seamen to be discharged and paid their wages before a shipping commissioner, in whose presence a mutual release shall be signed and attested by him,

if the parties agree upon a settlement, and further providing that "such release shall operate as a mutual discharge and settlement of all demands for wages between the parties thereto on account of wages in respect of the past voyage or engagement," a release so executed and attested without fraud or coercion is conclusive on the parties.

2. SAME.

The purpose of the statute in requiring settlements with seamen to be made before a shipping commissioner is to guard against their being overreached by the master, by placing the parties on an equal footing; and the provision of Rev. St. § 4552, that on the completion of any discharge and settlement "the master or owner and each seaman respectively, in the presence of the shipping commissioner shall sign a mutual release, * * * and the shipping commissioner shall also sign and attest it," does not require that all the parties shall appear before the commissioner and execute such release at the same time; but a master may leave with a commissioner a proposition for settlement, together with the wages due thereunder, and a release executed by him before the commissioner, and upon the acceptance of the money by the seamen, and the signing of the release by them, and its attestation by the commissioner, such release becomes effective, under the statute.

3. SAME—COERCION—FACTS CONSIDERED.

Seamen signed for service on a vessel employed as a government transport for a voyage to Manila and such other ports as the master might direct, and return to the Pacific Coast for discharge; the voyage not to exceed six months. At the expiration of the six months the vessel was at Manila, and they demanded their payment and discharge. Under orders of the military governor, their demand was refused, and on their refusal to serve longer they were arrested and confined by the military authorities, and subsequently returned to San Francisco by another vessel. In the meantime the transport had arrived and departed on another voyage; the master leaving with a shipping commissioner the amount of their wages to the time they were taken from the vessel, together with a release executed by him. On their arrival they demanded wages up to that time. They were told by the commissioner (in a joking way, as he testified) that they were lucky to get anything, and that they were not ordered shot at Manila. They were without money, and finally accepted the sum left with the commissioner, and executed the release. *Held*, that there was nothing in such circumstances amounting to legal duress or coercion, and that they were concluded by the release.

Appeal from the District Court of the United States for the Northern District of California.

H. W. Hutton and Walter G. Holmes, for appellants.

E. S. Pillsbury and H. D. Pillsbury, for appellee.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge. Appellants, who were libelants in the court below, signed shipping articles on November 1, 1898, before the United States shipping commissioner at San Francisco, for a voyage on the steamship Pennsylvania, described in the articles as follows: "From the port of San Francisco, California, to Manila, P. I.; thence to such other ports and places in any part of the world as the master may direct, and return to a port of discharge on the Pacific Coast of the United States; voyage not to exceed six calendar months,"— seven of the libelants as seamen at the wages of $30 a month each, and the other (James Mahoney) as a fireman at the wages of $45

per month. The Pennsylvania was owned by the respondent corporation, and was by it engaged during the voyage in question in transporting troops and supplies for the United States government. From San Francisco the ship went to Manila, and from there was ordered by the government to other places in the Philippine Islands, and returned to Manila on the 2d day of May, 1899, one day after the expiration of the "six calendar months" mentioned in the shipping articles. The appellants thereupon demanded their discharge and pay. The chief officer of the ship was sent by its captain ashore to see the United States consul at that port in regard to the matter. The consul said that he could do nothing, as martial law prevailed in the islands, and referred the officer of the ship to Maj. Gen. Otis, who was at that time military commander of the islands. Together they went to see Gen. Otis, who refused to permit the appellants to be discharged, and said that they must proceed with the ship to San Francisco under the same agreement they signed for before shipping. The chief officer then returned to the ship and reported to the crew the result of his interviews with the consul and with Gen. Otis, to which all of the crew agreed except the eight appellants. They refused to accede to the requirement, and persisted in their demand for their discharge and pay. The next day the second officer again went ashore to see the consul, who returned with him to the ship, and there told the appellants that they must remain with the ship, as Gen. Otis would not permit their discharge, and that if they insisted on leaving the ship they would have to go to prison. He thereupon indorsed the following upon the ship's articles: "By decision of Maj. Gen. Otis, military governor, made May 2, 1899, the time named in these articles is extended until S. S. reaches San Francisco, and conditions of service and pay of crew remain the same as under articles when signed,"—and signed the same, "Oscar F. Williams, U. S. Consul, Manila, P. I.," and affixed thereto his official seal. The appellants still insisting upon their right to their discharge and pay, and refusing to perform any further service on board the ship, Gen. Otis, under date of May 4, 1899, addressed to the consul the following letter, which the consul took with him on board the ship and read to the appellants:

"To Honorable O. F. Williams, Acting Consul of the U. S. under Philippine Military Government—Sir: In regard to the refractory seamen on the transport Pennsylvania, you will inform them that the vessel was held by the United States under war emergencies, and will be dispatched to San Francisco as soon as she can be coaled for the voyage. The crew on the vessel will depart with her. Such refractory members of the crew as will not abide by their instructions will be taken from the vessel and shipped under guard by another transport to the United States. They will not be discharged in Manila, nor will they be permitted liberty of action in the city, but will be held in close confinement until departure. You will make these instructions known.

"Very respectfully, your most obedient servant,
"V. (E.) S. Otis,
"Major General U. S. Volunteers, Military Governor."

The appellants still refusing to conform to these requirements, Gen. Otis on the 6th day of May, 1899, sent a police boat out to the

ship, and caused the appellants to be arrested and taken ashore, and there imprisoned. The Pennsylvania returned to San Francisco, and the appellants remained in confinement in Manila until the sailing of the transport Hancock, about six weeks thereafter, on which they were sent to San Francisco by the military commander. On his return to San Francisco with his ship, which was about the middle of June, 1899, the captain of the Pennsylvania called at the office of the shipping commissioner, and left with him the proper balance of a total of six months' pay for each of the libelants except James Mahoney, and for James Mahoney a balance which was $53.17 short of a total of six months' pay. The day after the libelants reached San Francisco they went to the shipping commissioner at that port for their discharge and pay, which they claimed should be for nine months, to wit, from November 1, 1898, the time the voyage began, to and including July 30, 1899, when they arrived in San Francisco. The shipping commissioner, through his deputy, offered them the money that had been left with the commissioner by the captain of the Pennsylvania, which the appellants objected to receiving, whereupon the deputy commissioner told the appellants that the money offered was all the master had left for them, and he added (jokingly, according to his testimony) that they were lucky to get that, and were lucky that Gen. Otis did not order them shot. The libelants were without money, and were strangers in San Francisco, from which place the Pennsylvania and her master had then departed,— the ship on a return voyage to Manila. The libelants objected a good deal to the amounts of money offered them, but finally agreed to take the money, saying that they would sue for the other three months' pay. Before the commissioner, however, would pay them the money left with him by the master of the Pennsylvania, the libelants signed the following release, which had been previously signed by the master:

"Form 1,614.

"Mutual Release.

"We, the undersigned seamen on board the S. S. Pennsylvania on her late voyage to Manila, P. I., do hereby, each for himself, by our signatures herewith given in consideration of settlements made before the shipping commissioner at this port, release the master and owners of said vessel from all claims for wages in respect of the said past voyage or engagement; and I, master of said vessel, do also release each of the seamen signing said release from all claims, in consideration of this release signed by them.

"June 15th, 1899.                          H. Doxrud, Master.

| Seamen's Names. | Station | Amount Received. |
|---|---|---|
| [Here follow names of members of crew other than libelants.] | | |
| Paid July 31st, 1899. Men left at Manila ret'd to S. F. by Hancock. | | |
| Gust. Hagelin, | Q-Master, | 186 57 |
| Peter Wiegner, | Seaman, | 177 50 |
| Viktor Pettersson, | Seaman, | 167 75 |
| Wictor Janson, | Seaman, | 148 95 |
| James Fitzgerald, | Seaman, | 157 95 |
| A. Hallfors, | Seaman, | 175 95 |
| James Mahoney, | Coal passer and fireman. | 201 83 |
| J. D. Mactaggart, | Seaman, | 178 00" |

The deputy commissioner testified in respect to this release as follows:

"I would not have paid them unless they signed this release, and I so told them. They all signed this receipt without any protest, either by using the word 'protest,' or otherwise. I sometimes tell a seaman, when he objects to the amount offered by the captain, and when I think he is entitled to more, that he can take the money offered 'under protest,' and in such a case I write the words 'under protest' in the receipt before he signs it. I did not do so in this case, as I was of the opinion that these men were not entitled to more. I did not look upon what they said as a protest. I would have written the words 'under protest' in the receipt if I had considered that they were taking the money under protest, even though they had not used the word 'protest.' I did not consider it essential to their making a protest that they should use that particular word, 'protest.' "

The release so executed is, among other things, relied upon in defense of the libel, and the court below held it conclusive against the appellants by virtue of the provisions of section 4552 of the Revised Statutes. Section 4549 of those statutes is as follows:

"All seamen discharged in the United States from merchant vessels engaged in voyages from a port in the United States to any foreign port, or, being of the burden of seventy-five tons or upward, from a port on the Atlantic to a port on the Pacific, or vice versa, shall be discharged and receive their wages in the presence of a duly authorized shipping-commissioner under this title, except in cases where some competent court otherwise directs; and any master or owner of any such vessel who discharges any such seamen belonging thereto, or pays his wages within the United States in any other manner, shall be liable to a penalty of not more than fifty dollars."

### Section 4552 declares:

"The following rules shall be observed with respect to the settlement of wages: First. Upon the completion, before a shipping-commissioner, of any discharge and settlement, the master or owner and each seaman, respectively, in the presence of the shipping commissioner, shall sign a mutual release of all claims for wages in respect of the past voyage or engagement, and the shipping-commissioner shall also sign and attest it, and shall retain it in a book to be kept for that purpose, provided both the master and seamen assent to such settlement, or the settlement has been adjusted by the shipping-commissioner. Second. Such release, so signed and attested, shall operate as a mutual discharge and settlement of all demands for wages between the parties thereto, on account of wages, in respect of the past voyage or engagement. Third. A copy of such release, certified under the hand and seal of such shipping-commissioner to be a true copy, shall be given by him to any party thereto requiring the same, and such copy shall be receivable in evidence upon any future question touching such claims, and shall have all the effect of the original of which it purports to be a copy. Fourth. In cases in which discharge and settlement before a shipping-commissioner are required, no payment, receipt, settlement, or discharge otherwise made shall operate as evidence of the release or satisfaction of any claim. Fifth. Upon payment being made by a master before a shipping-commissioner, the shipping-commissioner shall, if required, sign and give to such master a statement of the whole amount so paid; and such statement shall, between the master and his employer, be received as evidence that he has made the payments therein mentioned."

### By section 4554 it is provided:

"Every shipping-commissioner shall hear and decide any question whatsoever between a master, consignee, agent, or owner, and any of his crew, which both parties agree in writing to submit to him; and every award so

made by him shall be binding on both parties, and shall, in any legal proceedings which may be taken in the matter, before any court of justice, be deemed to be conclusive as to the rights of parties. And any document under the hand and official seal of a commissioner purporting to be such submission or award, shall be prima-facie evidence thereof."

Counsel for the appellants say in their brief:

"We have the authority not only of a court of admiralty, which, within its admiralty jurisdiction, acts on the principles of equity, but also the authority of a common-law court that a mutual release as provided for by section 4552 is not conclusive."

In the absence of any fraud or coercion, we should be much surprised to find any such decision, in view of the second subdivision of section 4552 of the Revised Statutes, in terms declaring that:

"Such release, so signed and attested, shall operate as a mutual discharge and settlement of all demands for wages between the parties thereto, on account of wages, in respect of the past voyage or engagement."

By the statutory provisions referred to, congress has provided two methods by which a settlement may be made between the master and the seaman of any merchant vessel engaged in a voyage from a port in the United States to any foreign port, or, being of the burden of 75 tons or upward, from a port on the Atlantic to a port on the Pacific Ocean, or vice versa; that is to say: The master and the seamen are authorized to assent to a settlement and sign a mutual release in the presence of a shipping commissioner, or they may agree in writing to submit to such commissioner any question in dispute between them for his award. And, to enforce the provisions in respect to the discharge of such seamen before a shipping commissioner, congress further expressly declared in the fourth subdivision of section 4552 that:

"In cases in which discharge and settlement before a shipping commissioner are required [by section 4549, supra], no payment, receipt, settlement, or discharge otherwise made shall operate as evidence of the release or satisfaction of any claim.".

The cases cited by counsel for the appellants in support of his position do not at all sustain it. In Schermacher v. Yates (D. C.) 57 Fed. 668, no such question was presented to or considered by the court. Indeed, it does not appear in that case that any release of any kind was ever signed by the seamen or master. The question there presented to and considered by the court was whether Key West or New York was "a final port of discharge in the United States," at which only, by the terms of the shipping articles, the crew could be discharged. The case of The Eclipse (D. C.) 53 Fed. 273, involved a payment of wages to seamen, not before a shipping commissioner, but by the managing owner of the vessel personally. Nothing purporting to be a release under section 4552 of the Revised Statutes was signed either by the men or by the managing owner. The men merely receipted in full for their wages. That case, therefore, not only came within the provision of the fourth subdivision of section 4552 of the Revised Statutes, declaring that no such receipt shall operate as evidence of the release or satisfac-

tion of any claim, but also within the general rule of the admiralty courts referred to in the opinion in the case of The Eclipse. The case of Rosenberg v. Doe, 146 Mass. 191, 15 N. E. 510, is directly in point, but it is against the position of the appellants. In that case the court had under consideration the provisions of section 4552 of the Revised Statutes, and of it said:

"We are of opinion that the statute means to make the release conclusive, if it is executed and attested as required, without fraud or coercion."

That case came before the court a second time, and is then reported in 148 Mass. 560, 20 N. E. 176; but it was at that time disposed of on other grounds, in no way affecting its former ruling.

It is insisted on behalf of the appellants that the release in question is invalid because the master of the Pennsylvania was not present with them before the shipping commissioner. The statute does not so require. In such cases as the present both the master and the seamen are required to appear before the shipping commissioner, and, in the event of agreement, to assent to such settlement, and to manifest such assent by signing a mutual release in the presence of the commissioner, who is required to sign and attest it, and retain the same in a book to be kept by him for that purpose. There is nothing in the statute expressly or by implication requiring the master and the seamen to appear before the shipping commissioner at the same time. No good reason is perceived why a proposition of settlement may not be left with the commissioner by the party making it, to be accepted or rejected by the other party when he appears before that officer. The chief reason why the admiralty law has always looked with distrust and suspicion upon an ordinary release or receipt given at the time of or before the payment of seamen's wages is that the men and master stand upon such an unequal footing that the former may be easily overreached, and to obviate that wrong was manifestly one of the objects of the legislation of congress requiring such settlement to be made before a shipping commissioner. That object would not be at all advanced by requiring the master and men to appear before the commissioner at the same time. Indeed, there would be less opportunity for the master to influence the seamen if he was not present. At all events, we find no express requirement that the master and men should be present before the commissioner at the same time, nor any implication to that effect. "The proviso," said the court in Rosenberg v. Doe, supra, "that 'both the master and seamen assent to such settlement,' is only attached to the requirement that the parties shall sign. If they do sign, the effect of their signatures must be determined by the ordinary rules of law."

In the assent of the appellants to the settlement, or in the execution by them of the release in question, was there any fraud or coercion? It is not pretended that there was any actual fraud, but it is insisted that the pecuniary necessities of the appellants, and the statement made to them by the deputy commissioner to the effect that they were lucky to get what the master had left for them, and that it was fortunate for them that the commander at Manila

did not order them shot, amounted to coercion. In respect to the remark of the deputy commissioner, which he admitted making, his testimony is that it was made in a joking way, and meant nothing. It does not seem reasonable that any sensible man would have been in any manner influenced in his action in San Francisco by being told that he was lucky in not being shot in Manila a month or so before. Nor is the fact that the libelants were in great need of the money paid to them sufficient to show that the release was signed by them under legal duress or coercion. French v. Shoemaker, 14 Wall. 314, 20 L. Ed. 852.

We agree with the court below that the execution of the release is conclusive against the appellants, and for that reason it is unnecessary to consider the other questions argued by counsel.

The judgment is affirmed.