BURNES et al. v. BURNES et al. (two cases). GATCH v. SAME. BURNES v. SAME.

(Circuit Court, W. D. Missouri, St. Joseph Division. September 19, 1904.)

Nos. 268, 279, 280, 283.

1. ADOPTION—LEGALITY UNDER MISSOURI STATUTES.

A paper, signed by two brothers and their wives, adopting the children of a deceased brother, and which was acknowledged and recorded as required by statute, although the wives were not separately examined as provided by the law of the state, *held* to constitute a valid adoption as to the men, under the laws of Missouri, which made the adopted children their heirs at law, subject to certain restrictions as to the right to inherit contained therein.

2. FAMILY SETTLEMENT—IMPEACHMENT—GROUNDS.

One of three brothers, who owned all their property in partnership, died, leaving all his estate by will to his two brothers equally, and re-

questing them to adopt his children, which they did. They continued to hold their property in common, and the estate had been largely increased in value, when, more than 20 years later, the second brother died intestate, leaving a widow and children. The surviving brother then proposed the formation of a corporation to take the common property, and that a division be made between the persons in interest, who were then all adults, by the allotment of stock to each. Although there was some opposition, he insisted, and declared that otherwise he would administer the estate as surviving partner, and the others would get only what the courts allowed them. After the matter had been under consideration for six months, an agreement for the formation of the corporation and the allotment of the stock was signed by all the persons in interest, except one, whose interest was bought by the others. The agreement was carried out, and thereafter the common estate was owned and the business managed by the corporation with marked success. *Held*, that the agreement for division of the stock, as a family settlement, would not be set aside or changed by the court, after a lapse of 12 years, on the ground that the acts and threats of the surviving brother, who was then the head of the family, amounted to duress.

**3. SAME.**

Some two years before the death of the second brother the partners made a gift to his two sons of securities aggregating $100,000 from the partnership estate, which was then of the value of about $600,000. The sons, after their majority, had given services to the partnership business, and the gift was stated in a joint letter signed by the partners to be "a token of our appreciation of your courtesy, friendly assistance, and uniform devotion to our interests." *Held*, that such gifts were entirely within the rights of the partners, who were sole owners of the property, and did not operate as a fraud upon the adopted children, which afforded ground for setting aside the subsequent settlement, although they had no knowledge of the gifts at the time the settlement was made; there having been no attempt at concealment by the surviving partner.

**4. SAME—SIGNING AGREEMENT WITHOUT READING.**

A family settlement with respect to the division of an estate will not be set aside because some of the parties thereto signed without reading it.

**5. CORPORATION—POWER TO PURCHASE ITS OWN STOCK—VALIDITY OF CONTRACT.**

In the absence of statutory or charter inhibition, a solvent corporation, having ample funds for the payment of its debts, has power to purchase its own stock, and such a corporation, which accepted a transfer of shares of its own stock under an agreement on its part to pay an annuity to the former owners, and has held and received the dividends on such stock, through a trustee, for a number of years, cannot avoid the contract as ultra vires.

**6. SAME—MISCONDUCT OF OFFICERS—FRAUD UPON STOCKHOLDERS.**

A corporation was organized to take over the property of a partnership, the members of which were brothers, after the death of one partner; the stock being divided between the surviving partner and the heirs of the deceased partner in accordance with a family settlement. On the death of the surviving partner, who was president of the company, his stock, in accordance with his wish, was transferred by his widow and daughter to the corporation in consideration of its agreement to pay them an annuity during their lives. The stock far exceeded the annuity in value. Five years later a nephew of the decedent, who was then president and a director of the company, conceiving that two cousins, then deceased, had received more than their share of the stock in the family settlement, procured the rescission of the agreement with the widow and daughter of the deceased president and a surrender of the stock to them, and its retransfer by them on like conditions to himself, in trust for the benefit of himself and the stockholders other than the heirs of the deceased cousins, who were misled and kept in ignorance of the purpose of such trust. The rescission was carried through by the votes of himself and two others of

the five directors, both having a like interest with himself. *Held*, that such transaction was fraudulent as to the stockholders thereby excluded from any interest in the stock so transferred, and would be set aside in equity, and the stock restored to the corporation for the benefit of all the stockholders.

## In Equity. Original and cross bills.

The first of the above-entitled cases is a bill in equity to establish between relatives the ownership of certain stock of a corporation known as the "Burnes Estate." The business of the corporation is banking, real estate, and other lines. Cases 279, 280, and 283 are auxiliary to the main or first case, and take their places on the docket by way of cross-bills.

In the early part of the year 1867 there were three brothers residing in Missouri—Daniel D. Burnes, Sr., James N. Burnes, Sr., and Calvin F. Burnes. The wife of Daniel D. Burnes had died in 1866, and he died testate in April, 1867, leaving the following children as his only heirs: (A) Lewis C. Burnes. (B) James N. Burnes, Jr. (C) Virginia D. Burnes. (D) Katherine B. Gatch. (E) Emma Winningham. (F) Mary H. Moore. The first four (A, B, C, and D) are defendants herein. Mrs. Winningham and Mrs. Moore are not brought in, as by sales and transfers other parties to the litigation own the rights which they would have taken by inheritance or otherwise. James N. Burnes. Sr., died in 1889, leaving as heirs his wife, Mary S., and two sons, D. D. and C. C. Burnes. The wife, Mary, S., transferred all her estate in equal shares to the two sons, D. D. and C. C. Burnes. She has since died. C. C. Burnes died intestate in 1893, leaving as his only heirs his widow, Frances B., and daughter, Marjorie, the complainants herein. D. D. Burnes died intestate in 1899, leaving as his only heir Kennett, a respondent herein. Calvin F. Burnes died intestate in 1896, leaving as his only heirs his widow, Kate H., and his daughter, Mary V. Burnes, respondents herein.

What property in value either or all of the three brothers owned in 1867 does not satisfactorily appear. There is evidence tending to show that the three had been in business as partners, and that the aggregate estates of the three was $50,000, making the estate of Daniel D., Sr., $16,666.66; and that is the contention of complainants. There is reason for believing that he was worth in excess of $40,000; and such is the contention of defendants. But this question is not very material, and in no sense decisive. He devised and bequeathed all of his estate to his two brothers, James N., Sr., and Calvin F., share and share alike. There was an expressed wish in the will that the two brothers would adopt his six children, all of whom at his death were minors; the eldest, James N., Jr., being 14 years of age, and the youngest, Virginia, being 1 year of age. But the recital in the will created no trust, and placed no burden on his estate, and the two brothers, by accepting the benefits therefrom, assumed no legal duty nor obligation.

The two brothers, shortly after the death of Daniel D., Sr., signed a paper adopting the six children. As to them it was properly acknowledged before an officer, and it was timely recorded in the proper county office. The wife of each of the adopting brothers signed the adoption paper, and the same acknowledgment by the same officer was taken as to them, which fails to show an examination of either of the wives separate and apart from her husband, as was then required by the Missouri statutes. Complainants contend that the adoption paper was and is void for two reasons: (1) It was not legally acknowledged as to the wives, and, not being legally acknowledged, it could not go of record as to them; recording being a necessary requisite in the adoption of the children. (2) The six children could not have two foster parents.

Within a few weeks after the death of Daniel D., Sr., James N., Sr., with his wife and children, moved into the house in Platte county in which Daniel D., Sr., had resided; and in that house, with his own family and the six children of Daniel D., Sr., he resided until 1873. From 1873, until deaths and marriages separated them, with exceptions which need not be stated, James N., Sr., and family, the six children of Daniel D., Sr., and Calvin F. and family, resided three miles to the south of the city of St. Joseph. The three families resided in the same house, it being a large one, situated on a tract of

land of more than 200 acres. They named it "Ayr Lawn." The two surviving brothers joined in all family expenses, each claiming, and I assume correctly, to be the half owner of all the property, and there seems to have been no accounts kept as between them. Here the two brothers and their wives, with the three sets of children resided for many years, as one happy, contented, and loving family. What either or both of these brothers possessed in 1867 does not clearly appear. Possibly they had little or nothing, as is contended by the defendants. Possibly they had, as complainants contend, over $30,000 in their own right, supplemented by over $16,000 received from their brother's estate. These matters are in doubt. But they had the surest of all assets for building up an estate—determination, will power well directed, and financial ability, akin to, if not, genius itself. The integrity of neither is questioned in the entire record, excepting as to the treatment of the six children in matters of advancements and the division of the estates. They greatly prospered up to January, 1889, when they were worth from $600,000 to $650,000, at which time James N. Burnes, Sr., died intestate.

The question then arose between Calvin F., the wife and children of James N., Sr., and the six children of Daniel D., Sr., as to what should be done in the matters of property. Calvin F. said he would administer upon the estate as surviving partner, but it is said by one or more witnesses that he was not in earnest as to that. He proposed pooling the assets in the form of a corporation, and allotting the shares, but not in equal parts. That was opposed by some. It is said in testimony that Calvin declared that it would be so done, or that those opposing would take the results of bitter, prolonged litigation. Some of the six children say they did not know before of their father's will, nor of the adoption paper. There were conferences between some, if not all. There were consultations between some of them and Gen. Moore, of Kansas City, a lawyer of ability, the husband of one of the six. The husbands of two of the others had something to do in the matter. At the end of six months a written agreement, reciting the facts, containing a copy of the will of Daniel D., Sr., and of the adoption paper, was signed by all of them, excepting Mary, the wife of Gen. Moore. This agreement was to the effect that the aggregate of the estates of the two deceased brothers and all of Calvin's property should be placed as the assets of a corporation known as the "Burnes Estate," with a capital stock fully paid up of $100,000, divided into 1,000 shares of $100 each, to be allotted as per recitals in the agreement. In 1889 the corporation under the laws of Missouri was thus formed, with the stock at least six times paid up, because the assets were then worth, as before stated, at least $600,000, now grown to be fully $4,000,000 in value. And by the agreements thus consummated the 1,000 shares were to be, and were, divided and issued to the persons as follows: (1) To the widow and two sons of James N. Burnes, Sr., 375 shares; (2) to Calvin F. Burnes, 375 shares; (3) to Mary H. Moore, 41 shares; (4) to the other five children of Daniel D. Burnes, Sr., 209 shares. But, as Mary Moore declined to go into the agreement, her shares were adjusted by a money payment to her. It will be observed that the other five children of Daniel D., Sr., took 209 shares, or about 41 shares each. The 41 shares which Mary H. Moore elected to not take, but to take money instead, were issued as follows: (1) The heirs of James N. Burnes, Sr., 21 shares; (2) the remaining five children of Daniel D. Burnes, Sr., 20 shares. Thereupon the 1,000 shares stood as follows: Heirs of James N., Sr., 396 shares; heirs of Daniel D., Sr. (Mrs. Moore excepted), 229 shares; Calvin F. Burnes, 375 shares. Mrs. Moore, in declining to go into the corporation, for the money paid her, relinquished her expectancy in the estates of Calvin F. and James N., Sr.

The agreement of settlement thus made, the formation of the corporation, and the allotment of shares is claimed by the defendants to have been the result of a fraud on them, to their injury, and the prayer by cross-bill is that said matters be canceled, and all parties to the record take such shares as they would have done by inheritance under the laws of the state; the adoption paper being treated as valid. They claim to have acted under the duress of Calvin F. They, or some of them, claim they did not know what they were signing. They claim Calvin F., as a foster parent, owed them the duty of making known all the facts; whereas, he concealed the important fact that

he and his brother, James N., Sr., had made large advancements to D. D. and C. C., the sons of James N., Sr. Shortly after the death of Calvin F. there was found among his papers an instrument in his own handwriting, with his name written therein. It was written in 1893, or at a prior time. It purported to be his last will and testament; but it was not otherwise signed than as above stated, and it was not witnessed. It therefore could not be admitted to probate. If it had been signed, attested, and probated, his entire estate, consisting of 375 shares of stock in the "Burnes Estate" corporation, would have passed to the corporation, subject to two burdens: (1) The payment by the corporation to his widow and daughter, or the survivor, for life, of an annual annuity of $12,000; (2) an annual annuity of $2,400 for life to his niece, Mrs. Winningham. The widow and daughter agreed to carry out this paper as though it were the last will and testament of Calvin; and all the stockholders likewise agreed to the same, the resolution therefor reciting the many high and good qualities of Calvin, and giving him credit for amassing this wealth. Mrs. Winningham at all times refused to accept the annuity. Subsequently the corporation with its moneys bought her 33 shares of stock, she receiving about $172,000 therefor. The stock was taken over in the name of Lewis C., who has at all times since voted the same, and that stock is yet in his name. The widow and daughter of Calvin for four years received from the corporation their annual annuities, aggregating about $50,000.

From the formation of the corporation until his death, a period of seven years, Calvin was the president, and practically controlled its affairs. Then until his death, a period of three years, D. D., was its president. From that time until the present Lewis has been its president, and was active during the presidency of D. D. The work at all times of the directors and other officers has been perfunctory and formal. When D. D. died in 1899, and Lewis became president, he saw, as he says for the first time, the evidences of advancements by his uncles, James N., Sr., and Calvin, to D. D. and C. C., sons of James N., Sr. Lewis made these facts known to his brother, and in the winter of 1900 repaired to St. Louis and consulted Hiram J. Grover, a lawyer of that city. In March, 1900, Mr. Grover prepared the following papers for signature: (1) A paper for the widow and daughter of Calvin to sign, addressed to the corporation, withdrawing the 375 shares of stock, taking it back to themselves, and agreeing to refund the $52,000 of annuities they had received; (2) resolutions for the board of directors to adopt, agreeing to the renunciation; (3) some papers, by which the widow and daughter would turn the 375 shares over to Lewis, in trust for himself and brother James N., Jr., and three of his sisters, Mrs. Moore being omitted, and Lewis and his associates in the trust to pay an annuity of like sums for the same time as four years before had been agreed upon by the corporation with the widow and daughter.

There was a special meeting of the board in June, 1900. At that meeting, the first-named paper, signed by the widow and daughter of Calvin, was presented by Lewis. There was an adjournment until the following day, when the board adopted the resolution. About that time the third paper was signed, and from then until now Lewis has held the 375 shares of Calvin stock for himself and associates, receiving such dividends as have been declared. He gave his obligations for a refund of the $52,000 of annuities, pledging part of the 375 shares of stock, and a part of his obligation he has paid. Frances B. Burnes, a complainant, owns 99 shares of stock, and her daughter, Marjorie, a like amount. But the company declines to surrender these shares until this hearing has been concluded. Kennett Burnes, a respondent, holds 197 shares. The company holds all those shares as collateral security for his note for a large sum, which he gave as evidence of the indebtedness of his father, D. D., to the corporation at the time of his death.

The following questions are for determination: (1) Should complainants, Frances B. and Marjorie, and respondent Kennett, have the shares of stock above referred to confirmed in them? (2) Should the settlement of July, 1889, the formation of the corporation, and the allotment of shares be confirmed or canceled? (3) Should the 33 shares of Mrs. Winningham stock be canceled? (4) Should the renunciation of June, 1900, by the widow and daughter of Calvin, be declared inoperative, or allowed to stand; and should the

resolution of the board, turning the 375 shares of stock back to the widow and daughter, be allowed to stand, or be canceled?

Frank Hagerman, Vinton Pike, and Noble B. Judah, for complainants.

O. M. Spencer, for respondent Kennett Burnes.

F. W. Lehmann and Stephen S. Brown, for other respondents.

McPHERSON, District Judge (after stating the facts). As to the adoption of the children and the rights of inheritance, the laws of Missouri alone control. So far as I am apprised by the briefs of counsel, there was no statute in 1867 providing for the consent by the children of Daniel D. Burnes, Sr., or for the consent by some one for them, for their adoption. Some of the states have such provisions. And in Missouri there was no judicial proceeding required for the adoption of the children. All that the statutes seem to require was the signing by the adopting parent of an instrument, its due acknowledgment, and recording. This was done by James N. Burnes, Sr., and Calvin F. Burnes. It was done without consideration, because Daniel D. Burnes, Sr., in his will, was specific in stating that his bequests to his brothers were not to be burdened or made subject to any conditions. So that it cannot be said, as argued by respondents' counsel, that there was any contract that could be enforced by any court.

It is not a question of the education of the children, nor their control, nor of exacting obedience. Nor can the adoption paper be construed as a will. Nor can it be enforced as a contract. Nor can the child inherit from one person's estate in the dual capacity of a blood relation and as an adopted child. But the child can inherit from his foster parent, even though he was adopted without his knowledge or without his consent. And he can inherit both from his natural father and the adopting father. Such is and has been the law of Missouri. As bearing upon the different phases of the foregoing, see Moran v. Stewart, 122 Mo. 295, 26 S. W. 962; Sarazin v. R. R. Co., 153 Mo. 479, 55 S. W. 92; Clarkson v. Hatton, 143 Mo. 47, 44 S. W. 761, 39 L. R. A. 748, 65 Am. St. Rep. 635; Fosburgh v. Rogers, 114 Mo. 122, 21 S. W. 82, 19 L. R. A. 201; Delano v. Bruerton, 148 Mass. 619, 20 N. E. 308, 2 L. R. A. 698.

There are cases holding that where the agreement to adopt was with the child, acted on and relied on by the child, it will be enforced as a contract. Sharkey v. McDermott, 91 Mo. 647, 4 S. W. 107, 60 Am. Rep. 270; Healey v. Simpson, 113 Mo. 340, 20 S. W. 881; Van Duyne v. Vreeland, 12 N. J. Eq. 142. But the adopted child has the rights, no greater and no less, of the natural child. Davis v. Hendricks, 99 Mo. 478, 12 S. W. 887. This being so, the father, natural or adopting, can disinherit the child, allow him to take a full share, or give him his entire estate, subject to the right of his wife, to the exclusion of his natural children. The adoption paper undertakes to limit the right of inheritance, by a recital somewhat involved, but understood, so that the six children would not take from the estate of James N., Sr., wholly, as if his children, but Calvin's children and his estate must be considered.

The adoption of children is a statutory proceeding, and all recitals of the statute are mandatory. When the statute is exceeded, the question arises, not whether it is a will, because it cannot be such, but whether it is valid to the extent that the adoption paper is within the statute. While that was a proper matter to be considered at the family settlement, in my judgment the adoption paper as to James and Calvin is valid. So I conclude as an original question that the respondents could have inherited from James N. Burnes, Sr.; he dying intestate. The widow of James N. Burnes, Sr., would have taken her share, whatever it was, and accordingly whether it was real estate or personalty, and, if realty, in what state situated, and whether he had individual interests or interests in a copartnership. Be all this as it may, the widow would have taken an interest or share, and the six children of Daniel D. Burnes, Sr., and the two children of James N. Burnes, Sr., would have taken the balance, complicated, by reason of the adoption paper, with the inchoate rights of the daughter of Calvin F. In my judgment such would have been the decree, had litigation between the parties hereto followed the death of James N. Burnes, Sr.

But Calvin F. Burnes was yet alive. What would have become of his estate? Aside from what his wife would take under the laws of the states where the property was situated, Calvin F. Burnes had the right to dispose of his property in any way he deemed best. He could buy, sell, or give during his lifetime. He could by will devise and bequeath to whomsoever he pleased. He could disinherit his daughter, Mary V. He could disinherit one, two, or all of the children of Daniel D. Burnes, Sr. In July, 1889, a few months after the death of James N., Sr., the formation of the corporation and an agreement as to its ownership was proposed. So far as disclosed by the evidence there was no concealment of any fact, unless it be with reference to some advancements presently to be mentioned. There was and could have been no fraud by concealment or false statement as to the assets or their value, because the property was divided by parts, and not by value. Even as to Mrs. Moore, there was set apart to her the same number of shares as to each of her brothers and sisters. And whether she was wronged when she refused to take her shares, and was paid comparatively a pittance, is no longer a question. And if it were a question, both complainants and respondents would occupy a like position as to her.

But Calvin F. was determined that there should be a reckoning, and an adjustment; and such was his right. He had the right to say that his future efforts should not be mortgaged. He had the right to say that by will he would disinherit C. C., or D. D., or Mary V., or any one or all of complainants or respondents. He had the legal right to say that the parties would take such shares, or that "they would take the drippings from the eaves of the last courthouse in Missouri"—a statement he is said to have made. The amount received from the estate of Daniel D. Burnes, Sr., was or could have been a controverted question then, as it now is. The validity or invalidity of the adoption paper of May 10, 1867, was then, or could have then been, a question for the courts, as it now is. The interpretation of that paper was then, as it now is, a question for the courts. That paper expressly says that

its effects shall be thus and so in the event of the intestacy of the adopting parties. The one had died intestate, and the other was living and could leave a will. There were no grandchildren when the adoption paper was signed. But in July, 1899, there were grandchildren, who could or might not be considered.

Payments had been made to C. C. and D. D. for alleged services rendered after becoming adults. They were large sums in fact, but small considering the station of the parties and the magnitude of the estate. Fraud is not charged as to these, other than that they were not made known. It can hardly be that the purpose of James N., Sr., or Calvin F., was to conceal the matters, because the proofs were purposely left where the matter would soon be made known. Some of the witnesses say these advancements were discussed at the time of the family settlement. Others deny it. Some say that, as D. D. and C. C. had only received $89,000 of the $200,000 promised, they were surrendering their claims to the remaining $111,000. Others deny this. But it is a fact that, whatever was or was not said at the family settlement, D. D. and C. C. had not received the one-half of the so-called "advancements," and that afterwards neither received nor asked for any of the balance of the $200,000.

Six months had elapsed from the death of James N., Sr. Mr. Moore and Mr. Winningham, husbands of two of the daughters of Daniel D., Sr., were lawyers, and Mr. Moore, it is claimed, a lawyer of ability. If there had been a common purpose "to take the drippings from the eaves of the last courthouse in Missouri," the respondents would have gotten a larger per cent. of the estate of James N. Burnes, Sr., and nothing from the estate of Calvin F. Burnes. Would they have a larger estate today? Would there not have been a winding up of the copartnership of James N., Sr., and Calvin F. Burnes? Would there not have been the distressing and bitter and expensive litigation which follows family feuds? Would there not have been partitions, and forced sales by sheriffs and receivers? Would not the business have been brought to an end, and would not Calvin F. have given his skill and energies for himself and family, and relatives who loved him? Or would he have continued amassing wealth for the benefit of those in litigation with him? Such was the situation when the family settlement was made. All the parties signed the settlement paper. All were adults.

James N. Burnes, Jr., says:

"There was much discussion as to the settlement. Calvin F., D. D., and C. C. and wife asked all to sign; and Uncle Calvin said it was that or nothing, and that, if we did not sign, he would administer upon the estate as surviving partner, and would see that we got nothing."

L. C. Burnes testified in effect:

"There was talk about my father's will and the adoption papers when we formed the Burnes Estate. I had not known of them before. Q. Why did you sign that [settlement] paper? A. Because I understood that I either had to sign that paper or there would be a fight in the family. Uncle Calvin told Gen. Moore that he could take the stock that was allotted to him, or take the drippings from the eaves of the last courthouse in Missouri."

Virginia Burnes says she signed the paper as presented to her by her uncle Calvin, and that she did not read it, and that it was not read to her, and she signed it because of her confidence in him; and she says she had no knowledge of the advancements to D. D. and C. C. Burnes, until since this litigation, and since Calvin's death her brother L. C. has attended to all her business. From 1897 until the present she has resided in Kansas City.

Mrs. Mary Moore testified in effect that, after the death of her uncle James, the division of the property was the subject of discussion. Her husband, Gen. Moore, had a copy of the will of her father and of the adoption papers, and from the advice of Gen. Moore she refused to sign the settlement paper, and took a money consideration in lieu of corporation stock.

Mrs. Gatch testified that she was never advised of her rights of inheritance, nor her father's will, nor of the adoption papers. The settlement paper was brought to her for signature by her brother James, and at his instance she signed it. She was asked by her brother to read it. This she declined, stating that she would not understand it, and then her brother explained it to her. She was much pleased, as she thought it was a gift, and generous. Her husband was present at the time.

Neither Mrs. Winningham nor her husband was called as a witness.

Relations of confidence had existed between Calvin F. and these respondents. He was their father by adoption, and since the death of James N., Sr., was the head of the household. But this relation had changed to one of threatened hostility. Gen. Moore was advising and dominated Mrs. Mary Moore in the matter. Husbands of two others were on the ground. So that I conclude, under the rule stated, supported by the authorities cited, that the parties and all of them are bound by the settlement agreement, the formation of the corporation, and the allotment of shares, unless they were controlled by duress or fraud. But a threat to hold back money justly due, or to make other arrangements, is not such duress as to avoid a contract. Gibbons v. U. S., 8 Wall. 269, 19 L. Ed. 453. Nor will want of money, nor distressing circumstances, avoid a contract of settlement. French v. Shoemaker, 14 Wall. 314, 20 L. Ed. 852; United States v. Huckabee, 16 Wall. 431, 21 L. Ed. 457; Mason v. United States, 17 Wall. 74, 21 L. Ed. 564. To be duress, the act must be physical violence, threats of violence or harm, or imprisonment, or threat of imprisonment. Brown v. Pierce, 7 Wall. 215, 19 L. Ed. 134; Baker v. Morton, 12 Wall. 158, 20 L. Ed. 262; Radich v. Hutchins, 95 U. S. 213, 24 L. Ed. 409.

The contention that some of the parties signed without reading the contract merits but little attention. Upton v. Tribilcock, 91 U. S. 45, 50, 23 L. Ed. 203, was a case where a party sought to avoid his subscription for corporate stock. Justice Hunt said:

"That defendant did not read the charter and by-laws, if such were the fact, was his own fault. It will not do for a man to enter into a contract, and, when called to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the words of his contract; and, if he will not read what he signs, he alone is responsible for his omission."

And see notes to this case in 8 Rose's Notes, 611, 617; McKinney v. Herrick, 66 Iowa, 414, 23 N. W. 767; Jenkins v. Clyde Coal Company, 82 Iowa, 618, 48 N. W. 970; McCormack v. Molburg, 43 Iowa, 561.

When the settlement was made, it was the result of thought, consideration, argument, and some bitterness, although the bitterness was kept from the public. Gen. Moore, a lawyer, the husband of one and the brother-in-law of the other five, was advising and with influence. His wife kept out, and refused to take the stock allotted her. The other five remained out for months. Then some of them concluded to and did sign the agreement and took the stock. The jarrings and wranglings of the family were thereby concealed from the public and, as was supposed, forever put out of sight. Whether the settlement was what a court of equity would have decreed is not the question. It was an agreement of settlement, and was supported by a consideration. It was a family settlement, and such settlements are seldom corrected or canceled. In 2 Pom. Eq. § 850, it is said:

"Compromises, where doubts with respect to individual rights, especially among members of the same family, have arisen, and where all the parties, instead of ascertaining and enforcing their mutual rights and obligations, which are yet undetermined and uncertain, intentionally put an end to all controversy by a voluntary transaction in the way of a compromise, are highly favored by courts of equity. They will not be disturbed for any ordinary mistake either of law or of fact, in the absence of conduct otherwise inequitable, since their very object is to settle all such possible errors without a judicial controversy."

For reforming or canceling a contract, courts require stronger proofs in cases of family settlements than in any other, and will even hunt for reasons to sustain such contracts, to the end that family secrets, disputes, and wranglings may be kept from the gaze of a curious and gossiping public. The law is stated by Justice Story, in his work on Equity (section 132):

"There are cases of family compromises, where upon principles of policy, for the honor of peace of families, the doctrine sustaining compromises has been carried further; and it has been truly remarked that in such family arrangements the court of chancery has administered an equity which is not applied to agreements generally. Such compromises, fairly and reasonably made to save the honor of a family, as in case of suspected illegitimacy, to prevent family disputes and family forfeitures, are upheld with a strong hand, and are binding when in cases between mere strangers the like agreements would not be enforced."

Lewis C. Burnes, a respondent, is the moving party herein, and for years has been the adviser of the other respondents, as he was of complainants. He was an administrator of the estate of Calvin F. Burnes. He charged himself with all of Calvin's stock, and took credit when he turned it over to the corporation. His statements of account were under oath. The estate was pending for two years. Presumably he had access to Calvin's books and correspondence. If he did not, it was because of his negligence in making no effort. He in particular, and his brother and four sisters and two brothers-in-law in general, either knew or had the means of knowledge of the estate of James N., Sr., the will of their father, and of the adoption record. The case of

Wood v. Carpenter, 101 U. S. 135, 25 L. Ed. 807, although construing a statute of limitations, has an opinion, with cases cited, that are pertinent to the record of this case. For 12 years the contract of settlement was allowed to stand. And then, when attempting to avoid it, they made a new contract with the widow and daughter of Calvin, which can be designated in no other way than as a gross fraud upon Mrs. Moore, if allowed to stand. And this is worthy of being stated, although Mrs. Moore, for reasons easily surmised, is not complaining.

James N., Sr., and Calvin F. Burnes, in the year 1887, had given stocks, bonds, and mortgages to D. D. and C. C. Burnes, the two sons of James N., Sr. A joint letter of the father and uncle was written to each (C. C. and D. D.), stating that $100,000 was to be given to each of them "as a token of our appreciation of your courtesy, friendly assistance, and uniform devotion to our interests." The following day (1887) the father and uncle wrote a letter to C. C. and D. D., stating inclosures for them jointly aggregating $100,000 in notes and evidences. What was realized on them does not clearly appear. But there is a reason for believing that $89,000 was the aggregate of what the two received pursuant to the purpose expressed by James N., Sr., and Calvin F. It is contended that these sums, whatever they were, were "advancements" under the laws of Missouri; and it is said that neither James N., Sr., nor Calvin F., the donors, nor C. C. nor D. D., the recipients, ever made known such advancements, and therefore a fraud was practiced upon the six children of Daniel D., Sr., and such a fraud as will allow them to avoid the family settlement of 1889. On this question I am impressed with the importance of several facts:

(1) On the charge of fraud, the four parties to the transaction are dead.

(2) The gift was made because of "your courtesy, friendly assistance, and uniform devotion to our interests." Many doubts exist, aside from the other facts, whether in turning over to C. C. and D. D. advancements were made to them; and, if they were advancements, a decree could go no further than to charge their heirs with the amount in fact received, with interest thereon.

(3) D. D. and C. C., after attaining their majority, had given services, and talents, and energy to the business of James N., Sr., and Calvin F. Burnes.

(4) The written evidence of the transaction was placed where it should have been, and was left where it would be seen by all having interest in, or to do with, the estate of James N., Sr., or Calvin F., or with the corporation. The respondents say they knew nothing of it until in 1899. If this be so, then Lewis C. and James N., Jr., who were administrators of Calvin's estate, and Lewis C., who was intimately connected with the corporation after Calvin's death, were guilty of inattention of their duties.

(5) Many years had elapsed before complaint was made, and several years more before the evidence is offered relating to it.

(6) Of the persons living, Gen. Moore knows as much or more than any other person as to the facts leading up to the family settlement. His testimony was not taken. He was the legal adviser of some or all respondents. He is, and then was, the husband of one of the six

children. He could not be called as a witness for complainants, and was not called by respondents; a fact which creates a presumption against them.

(7) Such matters should weigh with a court before declaring of record that James N. Burnes, Sr., and Calvin F. Burnes, long since deceased, practiced a fraud upon their nephews and nieces.

(8) Some of the facts of the last preceding paragraphs are true as to the widow and daughter of Calvin F. Burnes, whose only appearance in the case is by counsel and also by filing an answer not under oath.

In view of the foregoing, no other finding can be made than that James N., Sr., and Calvin F., did not, by making the gifts to C. C. and D. D., practice a fraud on the six children of Daniel D., Sr.; and it cannot be said that Calvin F. concealed this fact to bring about the family settlement, or that such fact entered in the settlement. And it is not made to appear but that C. C. and D. D. were entitled to an allowance because of "your courtesy, friendly assistance, and uniform devotion to our interests," as well as for services rendered. All, or nearly all, of respondents testify that they knew, during their life at Ayr Lawn, that C. C. and D. D were given extravagant sums of money, while they were held down to the necessaries and comforts of life; and yet, in making the family settlement, no question was raised as to these matters. The family settlement was made and the corporation formed upon the basis of the property owned by James N. Burnes, Sr., at his death, and not of what he once had owned, adding all the property Calvin F. Burnes owned in 1899. He was then free to do as he deemed best. He said he would put all in, and he kept nothing back. In my judgment the family settlement cannot be avoided by the gifts, or advancements, so called, to C. C. and D. D. Burnes.

By the Constitution of the state, corporations are created only under general laws; and by the same instrument it is provided that preferred stock cannot be issued excepting by unanimous consent of the stockholders, nor can the capital stock be increased other than by majority vote of the stockholders. I am unable to find any inhibition by statute upon the right of a corporation to take, hold, or own its corporate stock, or to reduce it by purchase and cancel it. Impliedly such rights are conferred, because provision is made that, before the stock can be diminished, the corporate debts must be cared for; and as the statutes also make provision as to stock that is pledged to a corporation, the corporation may and will become the owner thereof, if redemption is not made. The indebtedness of the Burnes Estate corporation is nominal. No creditor of the corporation has heretofore complained, and no creditor is now complaining, of the purchase of the Winningham or the taking of the Calvin F. Burnes stock. And, as all the creditors can be paid any day by check against moneys on hand, there can be no complaint by a creditor. Not only so, but the Constitution of Missouri provides against liability of a stockholder if the stock is fully paid up, making it immaterial whether there are few or many, or solvent or insolvent stockholders. And the stock of this company was many times paid for when it was organized. Therefore cases like that of Scovill v. Thayer, 105 U. S. 143, 26 L. Ed. 968, are without force in the case at bar, and throw no light upon the question as to the validity

of taking the Calvin F. Burnes stock. Nor do cases like that of Railroad v. Allerton, 18 Wall. 233, 21 L. Ed. 902, in any way persuade a court upon this question now at issue, because in that case an attempt was made over the protest of a stockholder to increase the amount of the capital stock.

The case at bar presents a question as to the right to cancel or purchase its own stock by a corporation, when no creditor is affected, when the corporate assets are not diminished, when no harm is done any stockholder, but when it is to the very great advantage of every remaining stockholder. The annual earnings of the 375 shares will more than pay the annuity of $12,000, and still add to the surplus fund; and the annuity after a few years will cease. But, whether the 375 shares subject to the annuity is an asset or liability, all the stockholders, including respondents, agreed to their purchase. Therefore the question, and the only question, is: Was the act of the corporation in taking the Calvin F. Burnes stock ultra vires, in the sense it could be avoided either by suit or by the directors?

There are many and ample provisions in the Missouri statutes requiring the Attorney General to take action against a corporation that exceeds its corporate powers. Chancellor Kent decided in Silver Lake Bank v. North, 4 Johns. Ch. 370, that an individual contracting with a corporation could not raise the question as to the corporate powers; and the Supreme Court has several times held the same. National Bank v. Matthews, 98 U. S. 621, 25 L. Ed. 188 (and see notes to that case in 9 Rose's Notes, 677); Railroad v. Lewis, 53 Iowa, 101, 4 N. W. 842.

This is not a case wherein one corporation is buying the stock of another corporation in like business, nor one corporation by contract merging with another; nor does it involve the charter duties of a public corporation, engaged in the performance of duties to the public. Respondents rely upon the cases of De La Vergne Refrigerating Mach. Co. v. German Sav. Inst., 175 U. S. 40, 20 Sup. Ct. 20, 44 L. Ed. 66; Pullman Co. v. Transportation Co., 139 U. S. 62, 11 Sup. Ct. 489, 35 L. Ed. 69; Pullman Co. v. Transportation Co., 171 U. S. 139, 18 Sup. Ct. 808, 43 L. Ed. 108. The facts of those cases were within the lines as above stated, and therefore are in no manner in point.

The powers of the Burnes Estate corporation, in part, as recited by the articles of incorporation, are as follows:

"Ninth. The purposes for which this corporation is formed shall be as follows, to wit: To buy, deal in, handle, hold, lease, mortgage, convey, pledge, and otherwise dispose of and acquire real estate, personal property, and choses in action, and all other kinds of property, including bank stocks of every kind or corporation whatever, whether mentioned herein or not, or whether of the same kind or character as herein mentioned."

So that the power to take the stock of Calvin F. Burnes has some support from the articles of incorporation. No harm to the public was done. The commonwealth makes no complaint. When not harmful to creditors, the Supreme Court of Illinois in Clapp v. Peterson, 104 Ill. 26, expressly held that a corporation can purchase its own stock. The opinion was based on the prior case of Railroad v. Town of Marseilles, 84 Ill. 643, in which several authorities are cited. Dupee v.

Boston Co., 114 Mass. 37. And see cases cited in National Bank v. Salem Co. (C. C.) 39 Fed. 89.

The arrangement to pay the annuity to the widow and daughter of Calvin F., and to take Calvin's 375 shares, was not ultra vires. And if there were any doubt about these questions, such doubts would be removed because of the long delay, the death of the actors in the transactions, the long acquiescence, either with knowledge of the facts, or without knowledge of such facts, which, if put to use, would have uncovered the entire situation. The fact that the corporation, as such, seeks by interested officers to urge the defense, is not controlling. After having the advantageous contract, and enjoying the benefits for years, it will not be allowed to urge the defense of ultra vires.

And if the contract with the widow and daughter of Calvin F. by the corporation was ultra vires, why was not the contract with Mrs. Winningham? By the unsigned will of Calvin she was to have an annuity. She declined to accept it. Then the corporation bought her stock and her interests, and Lewis C. has been holding them for years in trust for the corporation. And now he and his brothers and sisters, the corporation joining, want the contract with Mrs. Winningham for her stock to stand as valid, and a like contract with the widow and daughter of Calvin F. to be decreed as ultra vires!

The respondents are most earnest in their defense, upon the alleged invalidity of the transaction of the widow and daughter turning the 375 shares over to the corporation in consideration of the promised annuity, and upon the unfairness and invalidity of the original allotment of the shares. Yet for 15 years they have voted their stock. For years some of them have been officers; and at the last annual meeting they voted their stock, and over the protest of complainants they allowed Lewis C. to vote the Calvin F. stock. Lewis C. still votes the Winningham stock, paid for by the corporation. This corporation as a whole is legal or illegal. These transactions, not in part, but in entirety, are either legal or illegal. These matters must stand or fall as a whole, and respondents cannot challenge those against their interests and by the same reasoning be allowed to hold fast to that which is good. If it were ultra vires to buy Calvin's stock with a life annuity, it was ultra vires to buy Mrs. Winningham's stock; and yet the purchase has many times over been ratified by all the parties.

It is said that the life of the corporation may end long before the annuities cease. That question is foreclosed by the Union Pacific Bridge Case (Union Pac. Ry. Co. v. Chicago, R. I. & P. Ry. Co.) 163 U. S. 564, 16 Sup. Ct. 1173, 41 L. Ed. 265, wherein Chief Justice Fuller quoted with approval the views of Judge Sanborn in the same case when it was before the Court of Appeals, 51 Fed. 309, 2 C. C. A. 174. The Burnes Estate may not be rechartered; but if it ends by limitation, or is dissolved by its stockholders or by decree of court, who that has belief in the powers of a court of chancery can doubt but that the daughter of Calvin F. Burnes will be protected and given her annuities?

C. C. Burnes, one of the sons of James N., Sr., died in 1893. He was the husband of Mrs. Frances Burnes, and the father of Marjorie Burnes, complainants herein. He and Lewis C. were devoted to each

other. C. C. leaned upon Lewis. When C. C. was dying, he asked Lewis to protect and care for his wife and daughter, and Lewis made the promise. His subsequent relations and his correspondence led complainants to believe that he had the tender solicitude and loving care for them that a brother or father would have. The husband of this widow, and also her father, a man of affairs, had died. She relied, and had the right to rely, upon Lewis C. Burnes. The other son of James N., Sr., was president of the corporation, but Lewis was active and influential in its affairs. D. D., the president, died in 1899, and then practically the sole management of the corporation passed to Lewis C. Early in the winter of 1900 Lewis repaired to St. Louis and consulted Mr. Grover. In March, 1900, Mr. Grover prepared the so-called renunciation by the widow and daugther for them to sign. For some reason these papers were retained until June, when they were presented by Lewis C. to the board. Mrs. Frances Burnes was a member of the board, but had theretofore generally given her proxy to Lewis. She had given her votes to Lewis for president, and in all respects fully relied upon him. This meeting she attended, pursuant to a letter from Lewis; but the purpose of the meeting had not been disclosed to her. When the alleged renunciation by the widow and daughter of Calvin was read, and the proposed taking back of the 375 shares of stock, she demanded an explanation, displayed much temper, declaring that her daughter, and Kennett, her nephew, were being wronged. The meeting was adjourned until the following day. In the meantime she had consultations with her mother-in-law and Lewis, both of whom told her, as she says, that she was mistaken, and that the only purpose was to place the Calvin stock in the name of Lewis, in trust to secure the annuity due the widow and daughter of Calvin F. So believing, as she says, she went to the meeting next day, and the matter was consummated.

There were then five directors, viz., Lewis C., James N., Jr., Mrs. Gatch, Mrs. Frances Burnes, and Kennett. The latter was not at home. No one was present but the four. Much of what occurred is in controversy; but that Mrs. Frances Burnes was in a rage, and not in frame of mind to consider anything is told by all. Upon the resolution to surrender back the stock of Calvin F. to the widow and daughter of Calvin F., three directors, Mrs. Gatch, James N. Burnes, Jr., and Lewis C., voted aye. Being financially interested, had any of them the right to vote? Mrs. Frances Burnes is recorded as not voting. Kennett was not notified of the meeting and was absent from the country. Soon thereafter complainants went to Europe, where they remained over a year. During that time the nature of what had been done does not appear in the correspondence of Lewis. The stock book shows the 375 shares of stock to stand in the name of Lewis C. But none of the books show the nature of the trust. The widow and daughter of Calvin F. were to turn back to the corporation something over $50,000 in annuities they had received from the corporation. They did not do this; but it was done by the obligation of Lewis C. to the corporation, on which some payments have been made. The alleged trust between Lewis and the widow and daughter of Calvin F. was part of the same transaction as the action of the board and the attempted

renunciation. After nearly two years Kennett learned of what had been done. Upon the return from Europe of his aunt, Mrs. Frances Burnes, he told her. She expressed doubt, but sent an agent from Chicago to St. Joseph to see the records and learn the facts. He saw the records and learned the facts, excepting, when asking for the trust agreement with Lewis, the latter informed the agent that it was of no concern to his client, and refused to produce it or make known its terms. Thereafter this action was brought. So that, instead of litigation years ago, the survivors of these families, once living as one family, are now divided and in litigation. Kennett and Marjorie, although of age, but little more than children, had no knowledge of what was being done. The were largely interested. That Frances B. suspected wrong, but was quieted by Lewis C., thrown off her guard, and misled by one who had agreed to protect her, must be recorded as a fact. There was no consideration to support it. That it was a wrong to Mrs. Frances Burnes, and a gross one to Kennett and Marjorie, need only be stated. The widow and daughter of Calvin F. in no wise changed positions, other than to take Lewis C., and probably his brother and sisters, as guarantors of the yearly annuity, in lieu of all the assets of the corporation. It is too unfair, and too much against equity and fair dealing, to be allowed to stand.

I have not reviewed all the evidence in the case. There are other items of evidence that could be cited to strengthen the conclusions reached; and there are other items of evidence that, if cited, would tend to impair the conclusions reached. But such other evidence, both for and against the conclusions, are in no sense pivotal or controlling. The main questions of both law and fact have now been presented. Such is this case, of much interest to me because of the questions presented, the history of the parties, and their ancestors, and the development and growth of this vast estate, and of interest, because of the ability of counsel and of the eloquence in argument when the case was being submitted; but the case is a sad one, when we reflect that these three families once lived together in such happy union at Ayr Lawn, but now three families, divided, and with enmity and hatred one toward another. There remains for this court to order a decree in favor of the complainants and respondent Kennett Burnes, canceling as retired the Winningham and Calvin F. Burnes stock, confirming in them their respective shares, confirming the family settlement, the formation of the corporation, and the allotment of shares, declaring a liability against the corporation of $12,000 per annum during the life of the daughter of Calvin F., and to send the case to a master, to the end that Lewis may be reimbursed for his payments on account of the annuities, and that the exact situation may be made known to the court.

And such a decree will be entered.