**Lincoln W. MOMAN,
Plaintiff-Appellant,**

v.

**Phil WALDEN, Defendant and Commerce Union Bank, Defendant-Third-Party Plaintiff-Appellee,**

v.

**TRIAD ENTERTAINMENT CORPORATION, Peggy Walden, Third-Party Defendants,**

**and**

**Toni Wine Moman, Third-Party Defendant-Appellant.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Aug. 6, 1986.

Application for Permission to Appeal Denied by Supreme Court Oct. 27, 1986.

Scott F. Siman, Benson & Siman, Nashville, for plaintiff-appellant Lincoln W. Moman and third-party defendant-appellant Toni Wine Moman.

Cyrus L. Booker, Dearborn & Ewing, Nashville, for defendant-appellee Commerce Union Bank.

## OPINION

LEWIS, Judge.

Plaintiff Lincoln W. Moman filed his complaint against defendant, Commerce Union Bank (Bank), and sought to set aside a "Suretyship Agreement" he and his wife, third-party defendant Toni Wine Moman (Mrs. Moman), had signed guaranteeing $150,000 of a $300,000 debt of Triad Entertainment Corporation (Triad).

Both Momans alleged they signed the "Suretyship Agreement" under economic duress. Moman also sued Phil Walden, a co-owner of the corporation, who had, along with Walden's wife, signed a separate "Suretyship Agreement." Moman sought contribution and indemnity from Walden.

The Bank, in addition to filing its answer, filed a third-party complaint against Triad, Mrs. Moman and Mrs. Walden, and a counterclaim against Moman seeking to enforce the "Suretyship Agreement."

Subsequent to the filing of answers by the defendants, the Bank filed its motion for summary judgment against the Momans.

The only issue before the Chancellor in his consideration of the motion for summary judgment was whether the Bank exercised economic duress in obtaining the Momans' signatures on the "Suretyship

Agreement," dated April 19, 1984, guaranteeing $150,000 of Triad's corporate debt.

Tennessee Rule of Civil Procedure 56.03 provides, in pertinent part, as follows:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Under Rule 56.03, upon motion, summary judgment shall be entered against a party who failed to make a showing sufficient to establish the existence of an essential element to that party's case and on which the party will bear the burden of proof at trial. If the non-moving party fails to establish the existence of an essential element, there can be no genuine issue as to any material fact since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 285 (1986).

The Momans admit the execution of the "Suretyship Agreement" but allege that it was executed under economic duress and therefore void. The burden of showing economic duress is on the Momans. If they are unable to show that economic duress was used to obtain the "Suretyship Agreement," then summary judgment is appropriate.

Following our review of the record, we concur with the Chancellor in his finding that the Momans failed to establish that the Bank used economic duress.

The pertinent facts are as follows:

On March 15, 1984, Moman, Phil Walden, and William (Buddy) Killen formed Triad Entertainment Corporation to produce phonograph records.

Prior to March 21, 1984, Buddy Killen, who was a member of Commerce Union's Trust Board,[1] contacted Mrs. Nancy Breeding Chastain, who was at the time employed by the Bank as an account officer and manager of the entertainment industry division, and made a loan request for a $300,000 line of credit for Triad. Killen informed Mrs. Chastain that all three corporate principals and their wives would jointly and severally guarantee the corporate debt.

Killen informed Mrs. Chastain that a party would be held at Hillwood Country Club in Nashville on March 21, 1984, for the purpose of announcing the formation of Triad. He asked Mrs. Chastain to prepare the loan documents and be at the party so they could be signed since all the principals and wives would be together. Killen knew that the loan had not been approved by the Bank's loan committee and that the signing would be with the understanding that "it was not approved."

At the announcement party, Mrs. Chastain presented the note and Suretyship Agreements. Each Suretyship Agreement provided for a guaranty of $300,000.

When the documents were submitted to the principals for signature, Moman objected to signing a guaranty for more than $100,000. Killen then asked Mrs. Chastain if the Suretyship Agreements could be changed from $300,000 to $100,000. Mrs. Chastain informed Killen that that was not what they had discussed and that she would not have authority to make that kind of decision. Killen then stated: "Let's go ahead and make the changes, and we will continue with it and see what the approval process does indicate."

All of Mrs. Chastain's discussions regarding the loan were with Killen, although she does think the other two principals and their spouses were present when the conversation about the change in the Suretyship Agreements took place.

When Mrs. Chastain returned to the Bank, "internal discussions" were had

---

1. As a member of the Bank's trust board, Killen was not in any way involved in the approval or making of loans.

about the best way to present the loan to the Bank's loan committee.

After these discussions, it was decided that the loan could not be presented to the loan committee for approval with a "$100,000 guaranty by each principal." Mrs. Chastain "conveyed to Buddy we could not handle [the loan] on those terms."

The loan was presented to the loan committee on the basis that each of the principals would guarantee $150,000 of the loan.

Mrs. Chastain was transferred to Commerce Union's Chattanooga Bank and, on or about April 9, 1984, James Kellam, III, a Vice-President of Commerce Union, took over the "entertainment industry group" of the Bank and began dealing with Killen in regard to the Triad loan.

The Bank approved the loan provided each of the principals would sign a "Suretyship Agreement" guaranteeing $150,000 of Triad's $300,000 line of credit.

On April 17, 1984, Mr. Kellam called Killen to tell him the loan was approved contingent upon each principal guaranteeing $150,000. Killen advised Kellam he would discuss it with Moman and Walden and get back with him. Killen thereafter advised Kellam "they were willing to accept those terms."

Kellam then

took a note, promissory note, and three suretyship agreement forms to Mr. Killen's office, and Mr. Killen signed the note. The other two principals were to also sign the note and I had Mr. Killen sign his guaranty in front of me and left two guaranties that were to be either picked up or delivered to Mr. Moman and Mr. Walden later that afternoon.

·The signed guaranties were delivered to Mr. Kellam on April 19, 1984, "and the loan closed on April 19th and funds advanced on that date."

The Momans contend that the Bank, prior to April 19, 1984, had "partially" funded the loan which allowed Triad to commence business and that, thereafter, "the business of Triad became financially stressed or under extreme necessity for additional funds

in the form of lines of credit to cause the pressing and shipping of records." They insist this partial funding occurred because the Bank, subsequent to the March 21st signing of the $100,000 guaranties, funded the loan by accepting Triad's checks.

The record shows that no advances were made. The Bank did allow Triad to overdraw. However, it stretches the imagination to come to the conclusion that the Bank exercised economic duress on the Momans by paying Triad's checks instead of returning them because of insufficient funds.

This Court, in *Crocker v. Schneider*, 683 S.W.2d 335, 338–339 (Tenn.App.1984), adopted the following definition of economic duress.

[I]mposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress or extreme necessities or weakness of another; the theory under which relief is granted being that the party profiting thereby has received money, property or other advantage, which in equity and good conscience he ought not to be permitted to retain.

(citation omitted).

Here, the Momans chose to rely on Killen to arrange for the loan from the Bank. The record is clear that neither of the Momans had any discussion with any representative of the Bank regarding the loan or the "Suretyship Agreements" until after the April 21, 1984 "Suretyship Agreement" guaranteeing $150,000 of the $300,000 debt was signed.

The Momans made their decision to sign the guaranty based upon the information given to them by Mr. Killen.

■ The pressure of financial circumstances is insufficient to establish economic duress which will allow a party to avoid an agreement when the other party to the agreement is not responsible for the financial circumstances of the party. *In re French v. Shoemaker*, 81 U.S. (14 Wall.) 314, 20 L.Ed. 852 (1872); *see also Crocker v. Schneider*, 683 S.W.2d at 338–339.

■ This record is devoid of any evidence that the Bank is guilty of using economic duress to obtain the Momans' "Suretyship Agreement."

The "Suretyship Agreement" dated April 19, 1984, is valid.

The Momans also contend that the "trial court erred in ruling that Lincoln W. Moman and Toni Wine Moman are liable for the attorneys fees of the Bank in pursuing other sureties."

Mr. Killen, Mr. Walden and his wife, Peggy Walden, and the Momans each signed separate and distinct Suretyship Agreements. The "Suretyship Agreement" executed by the Momans provides, in part:

This suretyship shall be a continuing, absolute and unconditional guaranty, and shall apply to and cover all loans, discounts or renewals thereof made by the Bank to the Debtor and any and all indebtedness, of any nature and howsoever arising or created or evidenced, owing to said Bank by said Debtor....

The "Suretyship Agreement" defines the debtor as "TRIAD RECORDS, a division of Triad Entertainment Corporation."

Nowhere in the "Suretyship Agreement" does the term "Debtor" include other sureties or guarantors. The "Suretyship Agreement" provides that the undersigned sureties (Lincoln W. Moman and Toni Wine Moman) are liable for the amount of the debt they guarantee "together with all expenses, legal and/or otherwise (including court costs and attorney's fees) incurred by said Bank in collecting or endeavoring to collect such indebtedness or any part thereof, in protecting any collateral, and in enforcing this suretyship agreement."

■ We are of the opinion that the "Suretyship Agreement" which was prepared by the Bank does not provide for the payment of attorney's fees by the Momans which were incurred by the Bank in its attempt to enforce a separate and distinct suretyship agreement.

The Momans, under the suretyship agreement, are liable for attorney's fees incurred by the Bank in its attempt to collect from the debtor and/or attorney's fees incurred in the suit against the Momans.

That portion of the judgment of the trial court allowing the Bank to recover from the Momans for attorney's fees incurred in its attempt to enforce the separate suretyship agreement is reversed. On remand, the Chancellor shall conduct a hearing to determine the amount of attorney's fees incurred by the Bank in its attempt to collect from the debtor, Triad, and in its enforcement of the "Suretyship Agreement" executed by the Momans.

In all other respects the judgment of the trial court is affirmed with costs assessed one-half to the Bank and one-half to plaintiff Lincoln W. Moman and the cause remanded to the trial court for the collection of costs and further necessary proceedings.

KOCH, J., and KIRBY MATHERNE, Special Judge, concur.