**OMNI AVIATION, Plaintiff–Appellant,**

v.

**Ernest Clifton PERRY and John Hancock Cheek, Jr., Defendants–Appellees.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Dec. 19, 1990.

Application for Permission to Appeal Denied by Supreme Court March 11, 1991.

Donald Capparella, James M. Doran, Jr., Manier, Herod, Hollabaugh & Smith, Nashville, for plaintiff-appellant.

Maclin P. Davis, Jr., John P. Doyle, Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Nashville, for defendant-appellee John Hancock Cheek, Jr.

Charles C. Morrow, Morrow and Associates, Nashville, for defendant-appellee Ernest C. Perry.

## OPINION

LEWIS, Judge.

This is an appeal by Plaintiff Omni Aviation (Omni) from the trial court's granting of defendants' motion for summary judgment and dismissal of its complaint.

The pertinent facts are as follows:

Tom McCarthney is the owner and president of Omni and also the son-in-law of defendant John Cheek (Cheek). Cheek and defendant Ernest C. Perry (Perry) planned a trip from Nashville, Tennessee, to Aspen, Colorado.

They, along with four passengers, were to fly in a six-passenger Cessna 421B which belonged to Omni. Cheek was to be the pilot in command.

Both Cheek and Perry are experienced aircraft pilots. They were checked out in the Cessna 421B by Tom McCarthney on several occasions to determine their competence in the Cessna 421B prior to their flight to Aspen.

Prior to their departure from Nashville, Perry performed a "weight and balance computation" on the Cessna and determined that it was "within the allowable limits." The fuel tanks, which held approximately 194 gallons of fuel, were full.

On 1 December 1985, with Cheek acting as pilot, they left Nashville along with the four passengers.

Prior to leaving Nashville, Cheek filed an Instrument Flight Rules Flight Plan with the Federal Aviation Administration for the flight from Nashville, Tennessee. They were to fly via Walnut Ridge, Arkansas, Springfield, Missouri, and Chanute, Kansas to Hutchinson, Kansas, for a refueling stop. This was a distance of 570 nautical miles, and their estimated time enroute was three hours and forty minutes. However, due to excessively strong head winds, they were limited to ground speeds of between

118 and 129 knots. They tried several different altitudes but experienced no significant improvement in ground speed.

The defendants intended to refuel in Hutchinson, Kansas. However, after passing Chanute they calculated their time to Hutchinson and agreed that Hutchinson would be at their outer limit of available fuel. They turned back to Chanute and landed "with the main tank fuel gauges indicating 16 gallons remaining in each tank." Perry supervised the refueling and checked the oil in the plane, and Cheek obtained the weather reports and forecast for the remainder of the trip to Aspen. The "forecast was for clear flight by visual flight rules for the entire route."

They took on 162.2 gallons of fuel in Chanute. Based on the certified capacity of 197 gallons for the Cessna 421B, "this figure agreed closely with our fuel flow gauge indication of approximately 40 gallons per hour in main tank gauges, which had, at the time of the landing, indicated approximately 30 gallons of fuel remaining."

They departed Chanute on visual flight rules in order to "stay at a low altitude and avoid strong head winds at high altitude." Perry was acting as pilot in command on the flight from Chanute to Aspen. On the flight from Chanute to Aspen they had a "fuel consumption rate of 32 gallons per hour." This would have allowed them six hours and nine minutes of flight time before running out of fuel.

When they arrived over Aspen there were no openings in the clouds. They then called "Eagle Airport, for which legal IFR approaches are published and were informed that there were ten aircraft ahead of us for landing clearance if we chose to wait. We decided to return to Denver and headed back immediately."

They checked the weather conditions at both Centennial Airport and Stapleton Airport in Denver. They decided to go to Stapleton because the conditions were better. The fuel gauges indicated slightly over 20 gallons of fuel in each tank.

As they descended to an approach altitude, they contacted approach control to report their position and, as they did, the "left engine began to surge." This was reported to the air traffic controller and, almost immediately, they lost complete power in the left engine. This engine loss was reported to the air traffic controller, and an emergency was declared. They were given "a heading by the air traffic controller; and as we turned to this setting, the right engine began to surge and lost complete power."

Perry set the aircraft up for a forced landing. As they approached for the forced landing, they struck a power pole and sheared several feet off the top of the pole. Cheek's affidavit states in part:

Based on the time and distance calculations, the fuel consumption rate, the amount of fuel remaining, and the National Transportation Safety Board (NTSB) report of the fuel remaining in both the deformed and the leaking main tanks sixteen hours after the forced landing, there was sufficient fuel on board the aircraft to make a safe landing at either Centennial or Stapleton Airports with sufficient fuel in reserve. The fuel reserve, based upon calculations, was well within the limits for day or night flight under visual flight rules according to FAA Regulation 91.22.... When we crashed, we had been in the air approximately 4 hours and 35 minutes, which was well within the 6 hour and nine minute fuel endurance calculated upon our departure from Chanute.

Mr. Cheek further stated:

At the time of the trip, I did not know that there had been problems with fuel system icing on this type of aircraft which had resulted in failure of both engines. I did not know that Cessna Aircraft Company had developed a cure for the icing problem and had issued a letter, Cessna Information Letter M 84–37 (a true copy of which is attached as *Exhibit* 3, which alerted owners to the problem and how to cure the problem. I did not know that Omni Aviation had failed to take the action prescribed by Cessna to cure the problem on the aircraft I was flying. We were not warned

by Omni Aviation that we should take special precautions with this aircraft even though Omni Aviation was aware that we were likely to encounter extremely cold atmospheric conditions near our destination of Aspen, Colorado.

Omni opposed the defendants' motion for summary judgment with the affidavit of Richard G. Murray. Mr. Murray's affidavit, in pertinent part, is as follows:

1) My name is Richard G. Murray. I am the owner of Richard G. Murray and Associates.

2) I have reviewed the Federal Aviation Report and the National Transportation Safety Board Reports arising out of their investigation into the aircraft crash of Cessna 421 aircraft, registration number N–249JM on December 1, 1985. I have also reviewed the affidavits of Ernest Clifton Perry and John Hancock Perry, as well as Clifton R. Perry.

3) That, I have a Ph.D. in mechanical engineering from Oklahoma State University, a Masters of Science degree in mechanical engineering from Missouri School of Mines, and a Bachelors of Science degree in mechanical engineering from Southern Methodist University. I am licensed as a registered professional engineer (Oklahoma and Texas), a private aircraft pilot (FAA) and an air frame and power plant (A & P) mechanic (FAA). For the past twenty (20) years I have served as a consultant in engine and mechanical equipment problems for governmental, legal and insurance organizations, primarily dealing with aircraft, automotive and industrial equipment. I have served on the faculty of Oklahoma State University in the division of engineering technology and architecture. I was tenured as a full professor on the undergraduate faculty of the school of technology and as an associate member of the graduate faculty of the school of mechanical and aerospace engineering. I have approximately seventeen (17) publications dealing with a number of topics including various types of engines.

4) That, I have reviewed the above stated documents with the purpose of determining the cause of the engine failure on the above-mentioned aircraft.

5) That, a review of the Defendants' depositions in this case indicates that the most optimistic fuel consumption from Chanute to the crash site at sixty percent (60)% power with low head winds would indicate 6.8 gallons in each tip (main) fuel tank at the crash site.

6) That, any change in the power setting or headwinds reduces the available fuel below 6.8 gallons.

7) That, the calculations testified to by the Defendants are for a textbook flight in a new, clean aircraft with perfectly calibrated instruments and accessories.

8) That, these calculations do not account for fuel use by the gasoline fueled cabin heater and do not account for additional fuel required for a climb from 6,500 feet to 17,500 feet.

9) That, in my experience, real world airplanes never meet textbook performance; that actual speed is always slower and fuel consumption higher.

10) That, based on these fuel calculations, I believe there could not have been any usable fuel on board at the time the engines quit. This fact is in agreement with the estimated two or three gallons of residual fuel found by the National Transportation Safety Board.

11) Additionally, that when one descends in a Cessna 421, the tip tank fuel tends to flow to the front of the tank and away from the fuel tank outlet.

12) The aircraft, in question, is equipped to recirculate fuel from the front area back to the central area. The recirculation pump does not, however, always keep up with engine fuel needs. Therefore, one can expect fuel starvation to occur under these circumstances in a nose-down attitude with a few gallons of fuel in the tip tank.

13) Additionally, Defendant Perry does not claim to have observed any fuel pressure abnormality which would have been extremely high if, in fact, the manifold screen on this plane had been plugged.

14) Additionally, if, in fact, ice crystals had been the cause of fuel starvation, the gasolator screens and fuel control

screens would have had to plug prior to the manifold screen. In such a situation, one would expect a gradual fuel leaning to the engine which would at first, produce a low fuel pressure and at advanced stages, a rough running engine. Symptoms associated with these advanced stages would be a high exhaust gas temperature and intake system flashback. The soot normally found in flashback was not found in this situation.

15) It is my opinion the Defendants Cheek and Perry ran the aircraft out of fuel and violated several FAA regulations.

Both the affidavits of Cheek and Perry contend that the plane's engines failed due to a defect inherent in the design of the Cessna 421 which caused a condition known as "fuel icing" when the plane is used in low temperatures. The affidavits further state that the Cessna Aircraft Company had recognized this defect and developed a cure for it and that on 16 November 1984 Cessna had sent Omni written notice of the defect and instructions on how to correct it. Both affidavits aver that Omni did not correct the defect and did not notify Cheek or Perry of the existence of the defect. The defendants' affidavits further state that Omni, through its owner and president, knew that Cheek and Perry would be flying in low temperatures.

Plaintiff presents the following issue:

Whether the trial court erred in granting summary judgment where (1) there were competing affidavits filed by the opposing parties which were in direct conflict on the material issue of whether defendants/appellees ran out of gas and (2) the trial judge failed to consider the evidence in the light most favorable to the plaintiff/appellant.

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn.R.Civ.P. 56.03.

In determining whether or not a genuine issue of material fact exists, the trial court, and this Court on appeal, must look to all the evidence, take the strongest legitimate view of it in favor of the opponent of the motion and allow all reasonable inferences from it in the opponent's favor; discard all countervailing evidence; and if then there is any dispute as to any material determinative evidence or any doubt as to the conclusion to be drawn from the whole evidence, the motion must be denied. *Berry v. Whitworth*, 576 S.W.2d 351 (Tenn. App.1978).

The issue in this case is whether defendants Cheek and Perry negligently allowed the Cessna 421B to run out of fuel and crash.

In their affidavits filed in support of summary judgment, Cheek and Perry go into detail with respect to the length of time they were in the air on the Chanute to Aspen to Denver portion of the trip and in regard to their calculations concerning the re-fueling of the Cessna. They state there remained usable fuel on the Cessna at the time of the crash.

Their affidavits, if uncontradicted, would entitle them to summary judgment and a dismissal of Omni's complaint.

■ However, Omni, in opposition to the summary judgment motion, filed Richard Murray's affidavit which concludes the Cessna crashed because it ran out of fuel. If Mr. Murray's conclusion is based on admissible evidence, then summary judgment must be denied. *Fowler v. Happy Goodman Family*, 575 S.W.2d 496 (Tenn. 1978).

Defendants first argue that Mr. Murray is not qualified as an expert and his affidavit should be excluded. We respectfully disagree.

No objection was made in the trial court to the admissibility of Mr. Murray's affidavit. "Objections to the competency of evidence ... must be made when the evidence is offered *at the hearing*, or they are waived.... And where a ruling by the chancellor was neither asked nor made, the matter stands as though no objection was ever made to the evidence." *Erwin Nat'l Bank v. Riddle*, 18 Tenn.App. 561, 579, 79 S.W.2d 1032, 1043 (1934) (emphasis in original) (citations omitted).

The record before us does not disclose any objection made in the trial court to Mr. Murray's affidavit. An objection made for the first time in this Court comes too late. Defendants have waived their right to object to the admissibility and consideration of Mr. Murray's affidavit insofar as the summary judgment motion is concerned.

■ Defendants contend that Mr. Murray's affidavit should be disallowed in any event. They argue, and correctly so, that there is nothing in the record to show there was a "gasoline-fueled cabin heater" or that the Cessna climbed "from 6500 feet to 17,500 feet," thereby using additional fuel which flawed the defendants' calculations.

Plaintiff at oral argument asked that we take "judicial notice" of the fact that the plane would have had to climb from 6500 feet to 17,500 feet in order to go from Chanute to Aspen.

We are of the opinion that this is a fact which the Court may not "judicially notice." While we may take judicial notice that Aspen, Colorado is located in the Colorado Rocky Mountains, we cannot judicially notice that the plane would have climbed from 6500 to 17,500 feet. This is not a fact which the Court may act upon without proof. 29 Am.Jur.2d *Evidence* § 14 (1967).

■ While it may or may not be true that the Cessna 421 has a "gasoline-fueled cabin heater," we cannot "judicially notice" this as a fact.

Rule 703, Tennessee Rules of Evidence, provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tennessee Rule of Evidence 703 and Federal Rule of Evidence 703 are almost identical with the exception that Tennessee Rule of Evidence 703 adds the sentence: "The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." In this respect, Tennessee Rule of Evidence 703 expresses a greater concern with the bases of expert testimony than does Federal Rule of Evidence 703.

We have found no Tennessee appellate cases which have interpreted Tennessee Rule of Evidence 703. We, therefore, look to the federal cases for their interpretation of Federal Rule of Evidence 703 for guidance.

In *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666 (D.C.Cir.1977), the court held that Federal Rule of Evidence 703 was intended to broaden acceptable bases of expert opinion. It was not intended to make summary judgment impossible whenever a party has produced an expert to support his position, nor did it preclude summary judgment against a party who relies solely on an expert's opinion which has no bases other than theoretical speculations. The Rule requires that grounds relied on by the expert be of a type reasonably relied on by experts in the particular field and not mere unsupported assumptions. *Id.* at 672, 673. *See* also *Pennsylvania Dental Ass'n. v. Medical Serv. Ass'n.*, 745 F.2d 248 (3rd Cir.1984), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985).

■ Here Mr. Murray relies on "facts" which have no foundation in the record to support his opinion that "the aircraft ran out of fuel" and that this caused the crash.

His affidavit in this respect was properly disallowed.

■ In the face of the defendants' affidavits which show there was still adequate fuel at the time of the crash, it is incumbent upon the plaintiff to come forward with admissible evidence that the aircraft did run out of fuel. Without Mr. Murray's opinion testimony that the accident was caused by defendants' allowing the aircraft to run out of fuel, plaintiff failed to establish an essential element of its response to defendants' affidavits, and summary judgment is appropriate. *Moman v. Walden*, 719 S.W.2d 531 (Tenn.App.1986).

There are genuine issues of fact in this case. However, they are not material. Defendants insist in their affidavits that the crash was caused by "fuel system icing." Mr. Murray's affidavit disputes this fact. However, this is not a genuine issue of material fact and therefore does not preclude the granting of summary judgment. It is not incumbent upon the defendants to prove what caused the crash. Once defendants had filed their affidavits in which they swore that the cause of the crash was not their fault, it became incumbent upon the plaintiff to show that defendants allowed the aircraft to run out of fuel or otherwise negligently caused the crash. Plaintiff failed to do so.

The judgment is affirmed with costs assessed to the plaintiff/appellant Omni Aviation, Inc. and the cause remanded to the trial court for the collection of costs and any further necessary proceedings.

TODD, P.J., and CANTRELL, J., concur.