JUDY PARRISH,                                    )
                                                 )
      Plaintiff/Appellant,                )          First Circuit for
                                                 )          Davidson County
                                                 )          No. 93C-1343
VS.                                              )
                                                 )          Appeal No.
                                                 )          01A01-9601-CV-00010
HOSPITAL CORPORATION OF AMERICA,                 )
d/b/a CENTENNIAL MEDICAL CENTER'S                )
PARTHENON PAVILION,                              )
                                                 )
      Defendant/Appellee.                 )

IN THE COURT OF APPEALS OF TENNESSEE

MIDDLE SECTION AT NASHVILLE


APPEAL FROM THE FIRST CIRCUIT COURT OF DAVIDSON COUNTY

AT NASHVILLE, TENNESSEE


HONORABLE HAMILTON V. GAYDEN, JR., JUDGE



C. J. Gideon, Jr.
GIDEON & WISEMAN
414 Union Street
Suite 1900, NationsBank Plaza
Nashville, TN 37219
ATTORNEY FOR PLAINTIFF/APPELLEE

Sonya W. Henderson
218 W. Main Street
Suite One
Murfreesboro, Tennessee 37130
ATTORNEY FOR DEFENDANT/APPELLANT


AFFIRMED


                               HENRY F. TODD
                               PRESIDING JUDGE, MIDDLE SECTION



CONCUR:
SAMUEL L. LEWIS, JUDGE
BEN H. CANTRELL, JUDGE

| | |
|---|---|
| JUDY PARRISH ) | |
| ) | |
| Plaintiff/Appellant, ) | First Circuit for |
| ) | Davidson County |
| ) | No. 93C-1343 |
| VS. ) | |
| ) | Appeal No. |
| ) | 01A01-9601-CV-00010 |
| HOSPITAL CORPORATION OF AMERICA, ) | |
| d/b/a/ CENTENNIAL MEDICAL CENTER'S ) | |
| PARTHENON PAVILION, ) | |
| ) | |
| Defendant/Appellant. ) | |

FILED

July 26, 1996

Cecil W. Crowson
Appellate Court Clerk

O P I N I O N

The captioned Plaintiff has appealed from a summary judgment dismissing her suit

against the captioned Defendant for the wrongful death of Whitney Parrish by suicide while a

patient in Defendant's hospital.

The factual background of this controversy is:

> Whitney Parrish was a twenty-four year old,
> overweight, dyslexic, suffered from elevated
> cholesterol and triglycerides and hyperlipoproteinemia
> pheno type IV, and was voluntarily admitted to
> Parthenon Pavilion on April 20, 1992 by his psychiatrist,
> James R. McFerrin, M.D. because of a self-administered
> overdose on his mother's pain medication.  Mr. Parrish,
> who had a family history of emotional disorders and
> sexual abuse by an older brother, had been experiencing
> crying spells, sleep changes, suicidal ideations and an
> increase in his auditory hallucinations.

> Mr. Parrish presented with symptoms of agitation,
> delusions, dependency, hallucinations, paranoia,
> depression, and poor self-esteem.  The goals established
> by Dr. McFerrin following the admission of April 20,
> 1992, were to stabilize suicidality, treat Mr. Parrish's
> psychosis and depression, and ultimately discharge Mr.
> Parrish to out-patient treatment.   A treatment plan
> of milieu therapy, group therapy, activities therapy,
> family therapy, and medications was ordered and
> followed.

> Mr. Parrish was initially placed in the Intensive
> Treatment Program.  On April 27, 1992, on orders
> of Dr. McFerrin, Mr. Parrish was taken off of suicide
> precautions; and, on May 1, 1992, he was transferred
> to the General Treatment Program, which is an "unlocked
> unit,"

-2-

On May 7, 1992, Mr. Parrish approached the staff at Parthenon Pavilion and expressed feelings of frustration over multiple hospitalizations, his fear of returning to his job, and his father's death. Although Mr. Parrish was able to communicate some positive feelings and goals and although he stated to the staff after approximately thirty (30) minutes that he was feeling better, he was placed back on suicide precautions by the nursing staff.

On May 8, 1992, Dr. McFerrin discontinued the suicide and elopement precautions, and permitted Mr Parrish to go on a three (3) hour pass with his mother. Mr. Parrish returned from this visit in a bright mood and in good spirits, stating to the staff at Parthenon Pavilion that the pass had gone well.

On May 9, 1992, Mr. Parrish appeared somewhat anxious, but processed his thoughts and feelings appropriately. He spoke to the staff at Parthenon Pavilion about his plans to return to his job, stating that his employer had been thoughtful by sending him flowers. From 3:00 p.m. until 11:00 p.m., Mr. Parrish spent most of his time out of his room on the unit. He did his laundry, bathed himself, spoke to the staff again about his hope of returning to his job, appeared much less anxious, and provided no indications of a likely elopement or suicide attempt.

When Mr. Parrish was checked at 11:00 p.m. and at 11:12 p.m. on May 9, 1992, he was in bed in his room. When checked just after 11:15 p.m., Mr. Parrish could not be found. The supervisor, Dr. McFerrin, Mr. Parrish's mother, and all personnel on duty were notified and a search was conducted. At approximately 6:30 a.m. on May 10, 1992, Mr. Parrish's body was found in a ditch in the construction area beside Parthenon Pavilion's separate parking garage. Mr. Parrish had committed suicide by jumping from the sixth floor of the parking garage.

Judy Parrish, the mother of the deceased, filed this lawsuit and alleged that Parthenon Pavilion failed to use reasonable care to prevent Mr. Parrish's suicide, failed to provide a secure facility to Mr. Parrish, and failed to provide Mr. Parrish with proper care and treatment during his admission at Parthenon Pavilion.

`

The complaint alleges that Defendant had a duty to prevent the suicide of decreased, that it failed to perform that duty, and that the death of deceased was the proximate result of such failure.

Defendant's motion for summary judgment states:

> Comes now the Defendant, HCA Health Services of Tennessee d/b/a Centennial Medical Center/Parthenon Pavilion and moves this Court for an Order granting summary judgment in its favor on the grounds that there is no genuine issues of material fact and the Plaintiff's claims against it should be dismissed as a matter of law.
>
> In support of this Motion, the Defendant simultaneously files herewith and relies upon the following:
>
> 1)   Memorandum of Law; and
> 2)   Affidavit of James R. McFerrin, M.D.

The memorandum mentioned in the motion does not appear in the record on appeal.

The affidavit supporting defendant's motion states:

> I was Whitney Parrish's psychiatrist from 1985 through his admission at Parthenon Pavilion of April 20, 1992. As his treating physician, I am familiar with his psychiatric history, hospital course and medical record from his Parthenon Pavilion admission of April 20, 1992.
>
> I admitted Whitney Parrish to Parthenon Pavilion on April 20, 1992 after Mr. Parrish telephoned me to say that he had taken an overdose of his mother's Tylenol #3. Mr. Parrish had a history of severe recurrent depression and multiple suicide attempts by cutting his wrists and by taking overdoses of drugs. The goal during his admission was to stabilize suicidality, treat his psychosis and depression, and ultimately discharge him for continuation of his outpatient treatment. Mr. Parrish made progress during his stay at Parthenon Pavilion. He was transferred to a unit which did not remain locked at all times and preparations for discharge were being made which included a therapeutic pass with his mother and aunt and a scheduled meeting with his job counselor.
>
> Based on my many years of treating Whitney Parrish, it is my opinion to a reasonable degree of medical certainty that it was only a matter of time before Mr. Parrish was successful in his endeavor to end his life. With each hospitalization in the past, all resulting from failed suicide attempts, Mr. Parrish would meticulously plan his elopement or overdose for several days in advance. Throughout the course of his treatment, Mr. Parrish repeatedly discussed methods of self demise.

Plaintiff filed an affidavit stating:

I, the undersigned, Ben Bursten, M.D., first being duly sworn, make oath as follows:

1. I am a psychiatrist and have been licensed to practice medicine in the State of Tennessee since 1977.

3. I have reviewed the medical records of Whitney Parrish's 1992 hospitalization at the Centennial Medical Center's Parthenon Pavilion in Nashville, Tennessee. In addition, I have reviewed the Defendant's Responses to the First and Second Set of Interrogatories, the hospital's Policies and Procedures regarding suicide and elopement precautions, the Defendant's Motion for Summary Judgment, and the Affidavit of Dr. James McFerrin. I have also talked with Mrs. Judy Parrish.

4. In my opinion, Whitney Parrish's ability to exercise even a moderately intelligent power of choice regarding his suicide was severely compromised by his mental illness.

5. On May 8, 1992, Dr. McFerrin discontinued Mr. Parrish's elopement precautions in order that he might go out on a three hour pass with his mother. On his return to the hospital, the doctor felt he was sufficiently an elopement risk that he again ordered elopement precautions. Mr. Parrish was housed on a non-secure unit and was allowed to be out of the sight of staff sufficiently long enough for him to elope. This is a deviation from the standard of practice. This deviation led to this death.

6. It is my opinion, based upon a reasonable degree of medical certainty, that the recognized standard of acceptable professional practice in the medical profession, and in particular, the standards applicable to a psychiatric unit and hospital such as Hospital Corporation of America d/b/a Centennial Medical Center's Parthenon Pavilion, both for Nashville, Tennessee, and for similar communities at the time of Mr. Parrish's death required the hospital to place Mr. Parrish in a secure unit, or at the very least, under continual eye contact by the staff. Instead, Mr. Parrish was housed (rather than a locked door unit) in a non-secure unit and was allowed to be out of sight of staff sufficiently long enough permitting him to elope. He had a history of elopement. He had a history of suicidal ideation. This was known to Dr. McFerrin and the hospital staff. Dr. McFerrin ordered elopement precautions. This was known to the hospital, it was known to the nurses, it was generally known to the staff.

7. Based upon my review of his history, his chart, and otherwise my review of the entire case as set forth in this Affidavit, it is my opinion that

> failure to house Mr. Parrish in a locked, secure
> unit and allowing him to be housed without 1:1
> staff eye contact on an open door unit is the
> direct and proximate cause of his death. The
> issue of Mr. Parrish recovering from his current
> mental difficulties and doing well for some length
> of time, or having to be hospitalized again and
> ultimately recover or not, it something which is
> subject to debate. (Emphasis supplied)

The judgment of the Trial Court states:

> Having viewed the evidence in favor of the
> nonmoving party and having allowed all reasonable
> inferences in her favor, the Court deems as a matter
> of law that Mr. Parrish's act of suicide was a new
> and independent, efficient cause of his death which
> immediately ensured and allocated at least fifty
> percent of fault to Mr. Parrish's intentional act of
> suicide. Accordingly, the defendant's motion for
> summary judgment is granted.

It appears from the foregoing that two issues were presented by the motion for summary judgment and the evidence submitted in support of and in opposition to the motion:

(1) Whether the Defendant exercised due care in supervising its patient; and

(2) If not, was the effect of the negligence interrupted or liability therefore extinguished by the independent responsible act of the patient.

As to the first issue, the affidavit submitted by the Defendant states that the Defendant exercised due care, and the affidavit submitted by Plaintiff states the opposite. This creates a disputed fact as to the first issue.

As to the second issue, the affidavit submitted by Defendant supports the finding of the Trial Judge that the suicide was a conscientious, competent, knowing act of the deceased which sufficiently contributed to his death to defeat a recovery by his survivors. The affidavit submitted by Plaintiff contains the statement,

> Whitney Parrish's ability to exercise even a moderately
> intelligent power of choice regarding his suicide was
> severely compromised by his mental illness.

The foregoing quotation is the basis for a finding of a real dispute as to the mental competence of the deceased to commit an act which would bar an action for his wrongful death.

It is the burden of a party seeking a summary judgment to show to the Court that, under uncontradicted facts, the moving party is entitled to judgment as a matter of law by presenting competent evidence or admissions of the responding party that such conclusive fact or fact is undisputed. T.R.C.P. Rule 56.03; *Read v. Thomas*, Tenn. App. 1984, 679 S.W.2d 467; *Tucker v. Metropolitan Government*, Tenn. App. 1984, 686 S.W.2d 87.

The general rule is that, on Defendant's motion for summary judgment, the Plaintiff has no burden to produce evidence to support any allegation of the complaint unless and until the Defendant produces evidence to negate or avoid the effect of such allegation.

-6-

In *Moman v. Walden*, Tenn. App. 1986, 719 S.W.2d 531, Plaintiffs sued to avoid their liability upon a suretyship agreement for duress. The written agreement was prima facie evidence of an enforceable contract which shifted the burden to the Plaintiffs to produce evidence of the duress. In *Celotex Corp. V. Catrett* - US - 106 S. Ct. 2548, 91 L.Ed.2d 285 (1986), cited in Moman, the Defendant relied upon the sworn testimony of Plaintiff that she had no evidence to connect her injury to the acts or omissions of Defendant. Both of these authorities are exceptions to the above stated rule.

In *Bryd v. Hall*, Tenn 1993, 847 S.W.2d 206, the Supreme Court reversed a summary judgment, but reviewed the law as to burdens and standards relating to summary judgments. The Court said:

> *Celotex* was an asbestos products liability case in which the defendant, after an appropriate period for discovery, moved for summary judgment on the basis that no evidence had been produced by the plaintiff, the nonmoving party, that her decedent had been exposed to the defendant's asbestos products. At 319, 106 S.Ct. At 2551. The Court again upheld the grant of summary judgment for the defendant, as the moving party, because the defendant established the lack of a genuine issue of material fact on a crucial element of the plaintiff's case (exposure to the product). The plaintiff was unable to meet her burden imposed by Rule 56.05 with regard to that dispositive element, an element on which she would have the burden of proof at trial. *Id.* At 323, 106 S.Ct. at 2553. *Celotex* thus stands for the proposition that, after the moving party has established the absence of a genuine issue of material fact, then summary judgment is appropriate when, after being given a reasonable opportunity to substantiate its claims, the nonmoving party is unable to establish any essential element of its case on which it will have the burden of proof at trial. *Id.* at 321-325, 106 S.Ct. At 2552-53.

> At 321-325, 106 S.Ct. at 2552-53. Justice White's concurring opinion correctly places a finer point on the Court's holding by observing that "[i]t is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case." *Id.* at 328, 106 S.Ct. at 2555.

> *Celotex* may thus be cited for the principle that a party may move for summary judgment demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for directed verdict. If, after a sufficient time for discovery has elapsed, the nonmoving party is unable to demonstrate that he or she can indeed do so, summary judgment is appropriate. The Sixth Circuit has read *Celotex* to mean that "the movant [can] challenge the opposing party to 'put up or shut up' on a critical issue. After being afforded sufficient time for discovery ... if the [nonmoving party does] not 'put up,' summary judgment [is] proper." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989).

In *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), an antitrust suit, the Court again affirmed summary judgment for the defendants. The Court pointed out that summary judgment will be improper where the factual dispute is genuine *and* material *and* the nonmoving party comes forward with *specific* facts establishing an issue for trial. At 584-588, 106 S.Ct. at 1355-56. "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. at 586, 106 S.Ct. at 1356.

Today, we reaffirm the summary judgment principles found in the Tennessee cases discussed above. We also embrace the construction of Rule 56 in *Anderson, Celotex*, and *Matsushita* to the extent discussed in the prior section of this opinion relating to those cases.

[10, 11] Fourth, the party seeking summary judgment has the burden of demonstrating to the court that there are no disputed, material facts creating a genuine issue for trial, as we have defined those terms, and that he is entitled to judgment as a matter of law. A conclusory assertion that the nonmoving party has no evidence is clearly insufficient.

The trial court granted the Defendants' motion for summary judgment because "there was no material issue of fact." The Court of Appeals affirmed, explaining that the Defendants "sustained their burden by interrogatories directed to the Plaintiff who chose not to respond thereto, requiring the ultimate conclusion that there was no evidence to support his complaint." For the reasons discussed below, we reverse.

[14] The grant of summary judgment to the Defendants was improper.

In *Weathers v. Pilkington*, Tenn. App. 1988, 754 S.W.2d 75, this Court affirmed a directed verdict judgment for a physician whose patient committed suicide where "there was no evidence that his reason and memory were, at the time, so far obscured that he did not know and understand what he was doing and was therefore not a responsible human agency." In the present case, there is contradictory evidence as to the mental capacity of deceased.

In *Cochrum v. State*, Tenn. App. 1992, 843 S.W.2d 438, there was no evidence that the prison staff breached any duty to the inmate, or that the breach of any duty was the proximate cause of death.  In the present case, there is disputed evidence on both issues.

The present case is clearly distinguishable from the authorities discussed above in that there is contradictory evidence as to the two determinative issues.

Doubtful issues as to due care and mental capacity are not matters of law to be determined upon disputed evidence by summary judgment.

The judgment of the Trial Court is reversed and vacated.  Costs of this appeal are taxed against the Defendant - Appellee.  The cause is remanded to the Trial Court for further proceedings.

REVERSED AND REMANDED.

_____
HENRY F. TODD
PRESIDING JUDGE, MIDDLE SECTION

CONCUR:

_____
SAMUEL L. LEWIS, JUDGE

_____
BEN H. CANTRELL, JUDGE

Note to Judges,

      We initially agreed to affirm because the hospital obeyed the orders of the treating physician.  Upon study of the record, I reached a different conclusion.  If you disagree, lets meet and discuss.

_____
Henry F. Todd
Presiding Judge, Middle Section